UNITED STATES, Appellee,

v.

Jeffery L. AYERS, Sr., Staff Sergeant, U.S. Army, Appellant.

No. 99–0944.
Crim.App. No. 9701847.

U.S. Court of Appeals for the Armed Forces.

Argued April 6, 2000.

Decided Sept. 11, 2000.

Crawford, Chief Judge, concurred in part, dissented in part, and filed opinion.

Sullivan, J., filed dissenting opinion.

GIERKE, J., delivered the opinion of the Court, in which EFFRON, J., and COX, S.J., joined, and in which CRAWFORD, C.J., joined as to Issues III, IV, and V. CRAWFORD, C.J., filed an opinion concurring in part and dissenting as to Issue I. SULLIVAN, J., filed a dissenting opinion.

For Appellant: *Captain Donald P. Chisholm* (argued); *Colonel Adele H. Odegard, Major Scott R. Morris,* and *Major Kirsten V.C. Brunson* (on brief).

For Appellee: *Captain Paul T. Cygnarow-icz* (argued); *Colonel Russell S. Estey* and *Major Patricia A. Ham* (on brief).

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted adultery, attempted violation of a lawful general regulation, violation of a lawful general regulation (5 specifications), adultery, and indecent assault (2 specifications), in violation of Articles 80, 92, and 134, Uniform Code of Military Justice, 10 USC §§ 880, 892, and 934, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 4 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

We granted review of the following issues:

## I

WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE THAT APPELLANT COMMITTED INDECENT ASSAULTS AGAINST [PRIVATE FIRST CLASS TH].

## II

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT ON THE MISTAKE OF FACT DEFENSE REGARDING CHARGE III, SPECIFICATIONS 2 AND 3 (INDECENT ASSAULT).

## III

WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE THAT [U.S. ARMY COMBINED ARMS SUPPORT CENTER AND FORT LEE] REGULATION 600–27 WAS A LAWFUL GENERAL REGULATION.

## IV

WHETHER THE RECORD OF TRIAL IS NOT PROPERLY AUTHENTICATED.

## V

. WHETHER APPELLANT WAS PREJUDICED BY THE APPEARANCE OF UNLAWFUL COMMAND INFLUENCE WHERE THE CONVENING AUTHORITY WHO REFERRED THE CHARGES AND THE PANEL MEMBERS WHO SAT ON APPELLANT'S COURT–MARTIAL WERE EXPOSED TO PREJUDICIAL AND INFLAMMATORY PRETRIAL PUBLICITY CONCERNING COMMENTS MADE BY THE SECRETARY OF DEFENSE, THE SECRETARY OF THE ARMY, THE CHAIRMAN OF THE JOINT CHIEFS OF STAFF, THE CHIEF OF STAFF OF THE ARMY, THE [U.S. ARMY TRAINING AND DOCTRINE COMMAND] COMMANDER, AND OTHER HIGH–RANKING OFFICIALS WITHIN THE MILITARY CONCERNING THE CLASS OF CASES UNDER WHICH APPELLANT'S CASE FELL.

For the reasons set out below, we affirm in part and reverse in part.

### ISSUE I: SUFFICIENCY OF THE EVIDENCE

#### Facts

Appellant was an instructor at the U.S. Army Combined Arms Support Center at Fort Lee, Virginia. All of the offenses were based on his conduct with two female soldiers undergoing Initial Entry Training, Private First Class (PFC) TH, and Private (PVT) BD. Appellant's conviction of the two indecent assaults was based entirely on the testimony of PFC TH.

On September 13, 1996, appellant engaged TH in conversation while he was on duty as Charge of Quarters (CQ). During the conversation, appellant "started being flirtatious" with TH. Appellant told TH that a movie would be shown in the day room after bed check, and TH asked if she could come.

He responded that it would be her responsibility if she got in trouble, but it was her choice. The conversation ended with appellant giving TH his pager number by writing it on a small piece of paper in a lid of a soft drink bottle. TH entered the number in her electronic data book.

TH returned to her room and then went to the day room to watch the movie. Appellant left the day room and then called TH to come out into the lobby outside the day room. He asked TH to meet him in the operations room. TH went back to her barracks room, told her "battle buddy"[1] what was happening, climbed out her window into a breezeway, and waited for appellant. When appellant arrived, he told TH to come into the operations room and lock the door, and she complied. TH followed appellant into a conference room. She asked why they were going into the conference room, and appellant responded, "So nobody would see us."

In the conference room, appellant tried to shut the door, but TH held it partially open. Appellant asked TH if she was nervous and if she was afraid, and she responded "hell yeah" to each question. Appellant told TH not to be nervous "because he was driving the bus." He touched TH's face, breasts, and buttocks, and he kissed her. TH testified that she was scared, but she "wasn't really bothered by it." Asked by trial counsel if she was "a willing participant," she responded, "Yes."

Appellant then said something about checking on the CQ and he left. TH sat on a table and waited for him to return. Appellant returned and began giving TH a massage. He told TH to lie "belly down" on the table. He straddled her and began massaging her. TH testified that appellant started massaging her back and then "started going down further," until he exposed her vagina by moving her shorts and panties to the side.

TH testified that, at that point, she told appellant she did not want to have sex with him. Appellant kept touching her with his penis and telling her to relax, and she told him to stop. Appellant stopped and left the room. TH sat up on the table and waited for him to return. He returned and told TH that "there was a problem with the bay guard or something," and "there was some situation that [she] had to tend to." Appellant asked her to come back after she took care of the problem, but she declined, saying she was tired and going to bed. She left the conference room and returned to her room, climbing in through the window.

TH testified that she did not think much about the incident in the conference room. Asked how she felt about appellant, she said that she was interested in him at the time. She described her feelings as "infatuation for a minute I guess." When trial counsel asked her why she was not upset, she responded:

> Because to me it was just the situation of a guy and girl together and things happen, and a guy tries to see how far he can get, but then it doesn't go anywhere. I really didn't consider it an assault or rape or nothing like that. I didn't really pay much attention to it.

On several days after the incident in the conference room, TH called appellant's pager, and he returned her calls. He usually called her on the pay phones outside the day room.

About a week after the incident in the conference room, TH and her battle buddy "ran into" appellant during a break in training. Appellant told her to "ditch" her friend and meet him in a second-floor latrine that was under repair. TH asked her battle buddy to wait for her in a janitor's closet outside the latrine. TH waited in the latrine for 20–30 minutes until appellant arrived. Appellant began criticizing TH for the familiar way she talked to him, "because people might start thinking something." TH testified that appellant touched her face and tried to kiss her and touch her buttocks, but she "didn't want him touching [her]," and she backed away. Appellant stopped his advances and left the latrine.

---

1. A "battle buddy" is a fellow trainee assigned as a constant companion during Initial Entry Training.

TH explained that her feelings about appellant had changed between the incident in the conference room and the incident in the latrine. She had talked to her battle buddy and to her brother, who was in the military. Her brother told her that appellant could get in trouble for "messing" with her because she was a trainee. In addition, appellant's divorce was not final. Therefore, TH "just left him alone."

On cross-examination, TH testified that the situation with appellant was not something that she frequently thought about. Asked why not, she responded, "It's not that important to me."

Recalled as a prosecution witness in rebuttal, TH testified that she did not report her relationship with appellant to anyone in her command. She did not know how her command found out about it. She was summoned by her senior drill sergeant and questioned by her commander, and she told them what had happened between appellant and her.

The defense theory was that PFC TH's testimony was "total lurid fiction," and that the incidents never happened. In closing arguments, defense counsel argued that the government witnesses were not truthful and could not be trusted. During a conference on proposed instructions, the military judge stated, "[A]s I understand it, the defense is arguing an all or nothing. On that basis, I don't intend to give instructions by exceptions and substitutions." Defense counsel agreed. Neither the military judge nor counsel for either side mentioned an instruction on mistake of fact. Defense counsel did not request any additional instructions or object to the instructions that were given.

## Discussion

■ Legal sufficiency is a question of law that we review de novo. 2 Steven Childress & Martha Davis, *Federal Standards of Review* § 9.01 at 9–2 (3rd ed.1999). The legal test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ An element of assault is that the attempt, offer, or "bodily harm" be done "with unlawful force or violence." The act "must be done without legal justification or excuse and without the lawful consent of the person affected." Para. 54c(1)(a), Part IV, Manual for Courts–Martial, United States (1995 ed.).[2]

■ Based on this record, we conclude that no rational trier of fact could have found beyond a reasonable doubt that TH did not consent to the kissing and sexual touching that occurred in the conference room. We agree with our dissenting colleagues that TH told appellant to stop when he began progressing toward sexual intercourse. We disagree with their conclusion that a rational factfinder could find that appellant went beyond the sexual conduct to which TH consented. The dissenters assert that TH told appellant "to stop touching her body improperly." 54 MJ at 97. In our view, the dissenters fail to adequately consider the context of TH's testimony, both in respect to the situation in which the words were spoken and her conduct afterwards. TH did not tell appellant to stop touching her; she told him that she did not want to have sexual intercourse with him.

TH admitted that she knew appellant was being "flirtatious." She invited herself to the movie in the day room, sneaked out of her barracks room, and voluntarily followed him into the conference room. She admitted that she was interested in and infatuated with appellant. She admitted that she was "a willing participant." When appellant left the room to check on the CQ, she waited for him to return. She cooperated when he told her to lie "belly down" on the table, straddled her, and began massaging her.

When appellant indicated, by touching her vagina with his penis, that he wanted to have sexual intercourse, TH told him to stop. Appellant tried to persuade her to go further, telling her to relax, but she persisted in her

---

**2.** The current version of the Manual for Courts–Martial is unchanged.

refusal. Appellant then stopped and left the room. TH waited in the room for him to return. She testified that she "didn't consider it an assault or rape or nothing like that." Only after appellant returned to the room did she decline further activity, saying she was tired. Over the next few days, TH called appellant's pager and talked to him on the barracks telephone several times, and she voluntarily met with him again in an abandoned latrine. She did not report the incident until she was summoned to her commander's office and questioned about it.

Most telling was her testimony that the incident in the conference room was "the situation of a guy and girl together and things happen, and a guy tries to see how far he can get, *but then it doesn't go anywhere.*" In short, there was no unwanted sexual touching. TH drew the line at sexual intercourse, and appellant did not cross the line.

We also conclude that no rational trier of fact could have found beyond a reasonable doubt that an indecent assault occurred in the latrine. After the incident in the conference room, TH continued her relationship with appellant, calling his pager and talking to him on the barracks telephone. TH readily complied with his request to meet him in the latrine, and she waited 20–30 minutes for him to arrive. As soon as TH indicated that she no longer consented to appellant's advances, he stopped.

▮ We hold that the Government failed to carry its burden of proving lack of consent beyond a reasonable doubt. Accordingly, we will set aside the findings of guilty of Specifications 2 and 3 of Charge III. Our holding on the issue of consent does not affect the legal sufficiency of appellant's conviction of multiple violations of the regulation proscribing inappropriate contact with trainees, nor does it condone his behavior. While appellant's conduct with a trainee fell short of an indecent assault, his conviction of the regulatory violation clearly reflects that it was unacceptable.

In light of our disposition of Issue I, we need not address the merits of Issue II.

## ISSUE III: THE REGULATION

### Facts

At trial counsel's request, with defense counsel announcing "no objection," the military judge took judicial notice of several paragraphs of U.S. Army Combined Arms Support Command and Fort Lee Regulation 600–27, and he read the pertinent paragraphs to the court members. The regulation proscribes certain relationships between permanently assigned military personnel and Initial Entry Training Soldiers, including "any intimate or sexual relationship to include, but not limited to, dating, kissing, embracing, holding hands, or caressing." The regulation recites that it was promulgated "for the commander" of the U.S. Army Combined Arms Support Center and Fort Lee, who was the general court-martial convening authority for appellant's case.

Appellant now asserts that the Government failed to prove beyond a reasonable doubt that the commander personally issued the regulation. Appellant also challenges the authority of the official authenticating the regulation to do so. The Government argues that appellant waived any objection to taking judicial notice of the regulation.

### Discussion

Mil.R.Evid. 201, Manual, *supra*, authorizes a military judge to take judicial notice of "adjudicative facts." Mil.R.Evid. 201A authorizes judicial notice of domestic law. Mil.R.Evid. 201A(a) recognizes that domestic law is an adjudicative fact.

▮ A general court-martial convening authority is authorized to publish general orders and regulations. Para. 16c(1)(a)(i), Part IV, Manual, *supra*. A general regulation is a proper subject of judicial notice. *See United States v. Wales*, 31 MJ 301, 309 (CMA 1990). It is not necessary for the commander issuing a general regulation to sign it personally. "So long as 'the *decisional* authority, which is discretionary in nature, remains with the commander, ... the *signature* authority, which is delegated, is wholly ministerial in nature.'" *United States v. Bartell*, 32 MJ 295, 296–97 (CMA 1991), quot-

ing *United States v. Breault*, 30 MJ 833, 837 (NMCMR 1990). An official document, such as the regulation at issue in this case, is entitled to a presumption of regularity if it appears regular on its face. *See United States v. Johnson*, 10 USCMA 630, 636, 28 CMR 196, 202 (1959); *Breault, supra* at 838.

▮ Although appellant couches his assertion in terms of legal sufficiency of the evidence, his real attack on the regulation is founded in authentication. If the regulation is what it purports to be, then the evidence is legally sufficient to prove the existence of a general regulation prohibiting the acts allegedly committed by appellant. *See Jackson v. Virginia, supra.* Appellant, however, asserts that the evidence of record is insufficient to show that the regulation is what it purports to be. This assertion is an evidentiary objection, based on lack of proper authentication. *See* Mil.R.Evid. 901(a) ("The requirement of authentication or identification . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). Such an objection is waived if not timely made. Mil. R.Evid. 103(a)(1).

Based on the foregoing principles, we hold that any objections to judicial notice of the regulation or to the lack of authentication were waived.

### ISSUE IV: AUTHENTICATION OF THE RECORD

#### Facts

Colonel Larry R. Dean conducted the arraignment, ruled on a number of motions, and authenticated pages 1–65 of the record of trial. Colonel Alfred F. Arquilla conducted the remainder of the trial but did not authenticate his portion of the record of trial. The authentication page recites that he retired from active duty on May 26, 1997. The record was authenticated on September 10, 1997 by Captain (CPT) John C. Lynch, whose signature block identifies him as "trial counsel." For reasons not clear from the record, the statement, "I have examined the record of trial in the foregoing case," was inserted above the signature block for the authenticating official. This statement usually appears above only the defense counsel's signature block. The "Errata Correction Sheets" attached to the record reflect that CPT Lynch submitted four pages of corrections to the court reporter on September 3, 1997. The record of trial identifies CPT Gregory Bowman as trial counsel and CPT Lynch as the assistant trial counsel.

The record reflects that both CPT Bowman and CPT Lynch were qualified and certified under Article 27(b) and previously sworn under Article 42(a), UCMJ, 10 USC §§ 827(b) and 842(a). The record also reflects that CPT Bowman and CPT Lynch both participated extensively in the trial. Both litigated the defense motions before entry of pleas. CPT Bowman handled *voir dire* and challenges; the opening statement; examination of Private BD, one of the victims, and three other witnesses; closing arguments on the merits; sentencing evidence; and sentencing argument. CPT Lynch examined TH on the merits and in rebuttal, as well as four other prosecution witnesses. He represented the prosecution during discussions on instructions.

Appellant has not challenged the accuracy of the record. He asserts, however, that an assistant trial counsel is not authorized to authenticate the record. He also challenges the form of the authentication, arguing that the authenticating certificate is defective because it recites only that CPT Lynch "examined" the record. He argues that all post-trial proceedings are invalid because the record is not properly authenticated. The Government argues (1) that an assistant trial counsel is authorized to authenticate the record; (2) that even if it was incorrect for an assistant trial counsel to authenticate the record, there has been substantial compliance with Article 54, UCMJ, 10 USC § 854; and (3) appellant has not been prejudiced.

#### Discussion

▮ Article 38(a), UCMJ, 10 USC § 838(a), provides:

The trial counsel of a general or special court-martial shall prosecute in the name of the United States, and shall, under the

direction of the court, prepare the record of the proceedings.

Article 38(d) provides:

An assistant trial counsel of a general court-martial may, under the direction of the trial counsel or when he is qualified to be a trial counsel as required by [Article 27], perform any duty imposed by law, regulation, or the custom of the service upon the trial counsel of the court.

RCM 502, Manual, *supra*, implements Article 38, but it is somewhat more limiting. RCM 502(d)(5) provides that an assistant trial counsel may perform any duty which trial counsel may perform when acting "[u]nder the supervision of trial counsel."

Article 54(a) requires that the record of trial be authenticated "by the signature of the military judge." If the military judge cannot authenticate the record "by reason of his death, disability, or absence, it shall be authenticated by the signature of the trial counsel or by that of a member if the trial counsel is unable to authenticate it by reasons of his death, disability, or absence."

■ RCM 1104 implements Article 54. Two amplifying provisions are relevant to this case. RCM 1104(a)(1) provides, "A record is authenticated by the signature of a person specified in this rule who thereby declares that the record accurately reports the proceedings." RCM 1104(a)(2)(B) provides, "A person authorized to authenticate a record under this subsection may authenticate the record only as to those proceedings at which that person was present." The purpose of authentication is to ensure the verity of the record. *See United States v. Galloway*, 2 USCMA 433, 435, 9 CMR 63, 65 (1953); *United States v. Myers*, 2 MJ 979, 980 (ACMR 1976).

We hold that the record is properly authenticated. As a qualified and certified counsel under Article 27(b), CPT Lynch was authorized by Article 38(d) to authenticate the record. If he was acting "under the supervision of the trial counsel," or if he was detailed after the trial to act as trial counsel for the purpose of preparing the record, he was authorized by RCM 502(d)(5) to authen-

ticate the record. There is no evidence that he violated RCM 502(d)(5).

Even assuming *arguendo* that CPT Lynch was not detailed after the trial to be the trial counsel and that he was not acting under trial counsel's supervision, this technical, regulatory violation was harmless. There is no allegation and no evidence that the record is not accurate. The record reflects that CPT Bowman and CPT Lynch functioned as co-counsel, not as superior and subordinate. Each was statutorily qualified to ensure the verity of the record. The purposes of Article 54 and RCM 1104 have been satisfied.

■ Finally, we reject appellant's argument based on the form of the authentication, for two reasons. First, RCM 1104 provides that when a person signs the record as the authenticating official, that person "thereby declares that the record accurately reports the proceedings." Second, the four pages of corrections submitted by CPT Lynch to the court reporter clearly demonstrate that he did more than merely examine the record.

### ISSUE V: UNLAWFUL COMMAND INFLUENCE

#### Facts

On December 4, 1996, charges were preferred against appellant. The investigation under Article 32, UCMJ, 10 USC § 832, was completed on January 17, 1997. The investigating officer found the evidence insufficient to support a charge that appellant raped PVT BD, but sufficient to support all the other charges. He recommended that the case be referred to a special court-martial empowered to impose a bad-conduct discharge. The investigating officer reported that defense counsel had voiced "concern of the command climate here at Fort Lee because of the public 'sex scandal' that has been in the news lately at Aberdeen Proving Ground." The investigating officer concluded his report by stating, "I have felt no pressure from any individual or agency associated with The Army, Fort Lee, the local chain of command or the media."

The special court-martial convening authority dismissed the rape charge and forwarded the remaining charges, recommending trial by general court-martial. The remaining charges were referred to a general court-martial on January 31, 1997. The court-martial commenced on March 31, 1997.

At the court-martial, the defense made three motions arising from pretrial publicity: a motion to dismiss the charges because of unlawful command influence; a motion for appropriate relief based on unfair pretrial publicity; and a motion for a change of venue. The defense supported its motions with a large compilation of newspaper clippings, transcripts of news conferences, and television program transcripts, in which senior military leadership commented on allegations of sexual misconduct by drill sergeants at Aberdeen Proving Ground, Maryland.

Defense counsel did not assert that the referral decision was the result of unlawful command influence, and he conceded that no witnesses had expressed any reluctance to appear and testify, but he expressed concern about the impact of comments by senior leadership on court members. The military judge denied the defense motions.

During *voir dire* of the members, defense counsel asked the members no questions about the impact of pretrial publicity and public statements by senior military and civilian leadership. Trial counsel asked the members if they could decide the case "based solely on the evidence regardless of anything [they] may have heard or read in the media." All members responded in the affirmative. Trial counsel then asked the members if they would agree that "no outside pressures had influenced [them]," and they again responded in the affirmative.

In closing arguments on findings, trial counsel made no reference to the Army's senior leadership or to similar cases at other installations. Instead, trial counsel focused exclusively on the evidence in appellant's case. Likewise, trial counsel's sentencing argument focused on appellant's offenses.

Appellant now argues that the appearance of unlawful command influence was raised by the "enormous pretrial publicity, to include clear and succinct commentary by Army's military and civilian senior leadership, dealing with the class of cases under which appellant's case fell." Final Brief at 37.

Appellant asserts that the appearance of unlawful command influence was created by comments of the Secretary of Defense, William Perry; the Secretary of the Army, Togo West; the Chairman of the Joint Chiefs of Staff (JCS), General John Shalikashvili; the Army Chief of Staff, General Dennis Reimer; the Commander of the U.S. Army Training and Doctrine Command (TRADOC), General William Hartzog; and the Commander of the U.S. Army Ordnance Center and School, Aberdeen Proving Ground, Maryland, Major General Robert Shadley. The evidence recited in appellant's brief falls into four general categories: (1) Condemnation; (2) Investigation; (3) Training; and (4) Disciplinary Action.

(1) *Condemnation.* At a Pentagon news conference on November 7, 1996, the Secretary of the Army commented on the Aberdeen allegations by saying that "sexual harassment is particularly repugnant when it involves the abuse of authority." At the same news conference, the Army Chief of Staff said that everyone is "deeply troubled by the allegations of sexual misconduct and rape which occurred." He referred to the alleged conduct as "unacceptable." He was "particularly troubled by the abuse of power" that was alleged. He stated that he resented the allegations because they "tarnished the Army's reputation."

On the same day, in a news conference at Fort Monroe, Virginia, the TRADOC Commander commented on the Aberdeen cases by saying, "America deserves better than this. Our soldiers deserve better than this and our Army is better than this."

The Aberdeen Commander was interviewed by reporters on the same day and was quoted as saying that the alleged conduct at Aberdeen was the worst he had encountered in 30 years. He said, "What we want out in front of the formation is a leader, not a lecher."

On a television news program on November 11, 1996, the JCS Chairman characterized the Aberdeen allegations as a "great, great tragedy."

(2) *Investigation.* In a news interview on November 7, 1996, the Aberdeen Commander said, "We're going to find out what happened, why it happened, and take corrective action."

On a television news program on November 11, 1996, the JCS Chairman said that the services must "bring every complaint to the surface, investigate it properly and set what's wrong right." He said that the task is "to ensure that we find out exactly just how widespread it is and bring to justice all those who should be brought to justice." He promised to "get to the bottom of this."

On November 13, 1996, a network news program reported that the Secretary of Defense "ordered the entire military, not just the Army, to weed out sex offenders." During another news program several days later, the Secretary of Defense promised that the military would continue to be a leader in addressing sexual harassment problems.

On November 20, 1996, the Secretary of the Army directed the Inspector General to "assess the responsibility and accountability of the chain of command." On November 21, he created a "Senior Review Panel" to "examine how Army leaders throughout the chain of command view and exercise their responsibility to address sexual harassment, together with recommendations for improvement." At a news conference on November 22, the Secretary of the Army was asked if "heads would roll," and he responded, "I will not give you a statement today that says we're going to go out head hunting.... We will go where the evidence takes us." On March 13, 1997, the Secretary of the Army informed the House National Security Subcommittee that the Army Inspector General would review the outcomes of the cases at Aberdeen to "protect the rights of all."

(3) *Training.* At the Pentagon news conference on November 7, 1996, the Army Chief of Staff said, "Something broke down." During a television news interview on November 17, the Secretary of the Army reported that the Army Chief of Staff "sent out a personal letter to all general officers on active duty underscoring again the Army's position on sexual harassment," and that the Army had followed the letter with "training packages," including a video sent to "targeted commanders of the Army around the world."

(4) *Disciplinary Action.* On November 7, the Aberdeen Commander was quoted by reporters as promising to "take corrective action."

In a news interview on November 8, the Secretary of the Army said, "If violations have occurred, we will hold the perpetrators accountable." In another news interview on November 12, he said, "We will expose them and we will eradicate them. This is about NCOs who violated the law in the first instance ... [W]hen we punish, the word goes out."

In a newspaper article on November 12, the JCS Chairman was described as echoing "the outrage and commitment to seeking justice done that have been expressed by other senior defense officials." On the same day, a news article reported that the Army Chief of Staff vowed that "the service's leadership would move swiftly to ensure that those responsible are brought to justice."

On November 13, 1996, a television news program reported that an Army court-martial had "handed out a relatively light sentence" in a case at Fort Leonard Wood, Missouri. The program also reported the Secretary of Defense's order "to weed out sex offenders."

On January 10, 1997, a week before the Article 32 investigation was completed, a Fort Lee "spokesman" was quoted in a local newspaper as saying that disciplinary action in appellant's case could range from a reprimand to a general court-martial, but that the "lower end of the range is probably not going to be considered."

### Discussion

■ This Court has recognized that "the appearance of unlawful command influence is as devastating to the military justice system

as the actual manipulation of any given trial." *United States v. Allen*, 33 MJ 209, 212 (CMA 1991). Appellant does not assert that his trial was actually manipulated by senior military leadership. Instead, he asserts that the widespread dissemination of pronouncements by senior leadership created the appearance of unlawful command influence.

██ Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact under a clearly-erroneous standard, but we review *de novo* the legal question whether those facts constitute unlawful command influence. *United States v. Wallace*, 39 MJ 284, 286 (CMA 1994).

██ The initial burden is on the defense to "show facts which, if true, constitute unlawful command influence." At trial, the defense must show "that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." On appellate review, the defense must show that the proceedings appeared to be unfair and that the unlawful command influence was the cause of the appearance of unfairness. The quantum of evidence required to raise the issue is "some evidence," more than mere allegation or speculation. *United States v. Biagase*, 50 MJ 143, 150 (1999).

There is no dispute about what was said by senior military leaders. The dispute is whether what was said constitutes actual or apparent unlawful command influence. We hold that appellant has failed to meet his initial burden of showing facts which, if true, would constitute actual or apparent unlawful command influence on the findings.

Unlike the situation in *United States v. Kirkpatrick*, 33 MJ 132, 133 (CMA 1991), the views of the senior leadership were not injected into appellant's court-martial, by arguments of counsel or otherwise. The evidence presented by appellant reflects comments of the senior military and civilian leadership that appear to have been precipitated by events at Aberdeen Proving Ground, not Fort Lee.

We need not and do not decide whether the comments of senior military and civilian leaders might have injected actual or apparent unlawful command influence into the courts-martial at Aberdeen. Our focus is on appellant's court-martial, not other cases. None of the comments contained in this record suggested that appellant was guilty. Appellant did not link the media publicity to his case. He did not present any evidence that his court-martial appeared unfair as a result of the alleged unlawful command influence. Accordingly, we hold that appellant failed to carry his initial legal burden of showing that the "alleged unlawful command influence ha[d] a logical connection to [his] court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase*, 50 MJ at 150.

Our holding is limited to the findings. We need not decide if there was actual or apparent unlawful command influence on the sentence, because our resolution of Issue I requires that we set aside the sentence.

### DECISION

The decision of the United States Army Court of Criminal Appeals affirming the findings of guilty of Specifications 2 and 3 of Charge III and the sentence is reversed. The findings of guilty of Specifications 2 and 3 of Charge III are set aside and those specifications are dismissed. In all other respects, the decision below is affirmed. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals. That court may reassess the sentence or order a sentence rehearing.

CRAWFORD, Chief Judge (concurring in part and dissenting in part):

I concur in the result which the majority reaches with respect to Issues III, IV, and V. Additionally, I conclude that appellant has failed to carry his burden of showing any facts which, if true, demonstrate any actual or apparent unlawful command influence affecting his sentence.

As I read the facts and TH's testimony differently than does the majority, I respect-

fully dissent from the reversal of appellant's conviction for indecently assaulting TH on two occasions. The majority appears to equate TH with Ado Annie Carnes, the character in Rodgers and Hammerstein's hit musical Oklahoma, who sings "I Cain't Say No!"[1] Since I believe that "no" means "no," I, like country music singer Lorrie Morgan, ask the majority, "What part of no don't you understand?" *See* <http://www.country cool.com>.

## SUFFICIENCY OF THE EVIDENCE

Appellant was a 28–year–old married non-commissioned officer standing six feet, four inches tall, weighing 210 pounds, with over 10 years of service at the time of trial in May 1997. The victim, TH, graduated from high school in Des Moines, Iowa, in May 1996. She went to basic training the following month and arrived at Fort Lee, Virginia, in September 1996, shortly before she was approached by appellant. At the time of trial, TH was 18 years of age.

As aptly summarized by the trial counsel in his opening statement: "This case is about a noncommissioned officer ... who chose ... to commit crimes against the most vulnerable, the most defenseless, and sadly, the most impressionable of all soldiers the Army has. He chose to commit crimes against trainees."

While on CQ duty, appellant began flirting with the victim, contrary to regulations and despite his status as a noncommissioned officer, as well as the commander's representative after normal duty hours. He informed TH that a movie would be shown in the company day room after bed check if she was willing to risk getting caught. After bed check (midnight), the victim left her room by a window and returned to the day room. Upon returning, appellant told TH to go to the operations room and lock the door. Once in the conference room (which adjoined the operations room), appellant began to kiss TH and felt her face, buttocks, and breasts. TH testified, "I was scared, but I wasn't really bothered by it." She admitted that she was a willing participant at this juncture.

After a while, appellant left the conference room, saying that he needed to go check on something at the CQ desk (a post which he presumably abandoned while having his romantic interlude with TH). When appellant returned, TH was sitting on a table in the room. Appellant started giving her a massage and told her to "lay down on the table, belly down." TH "did as he said." Appellant straddled the victim, continuing to massage her back, until he eventually moved her shorts and underwear, exposing her vagina. The record then discloses the following colloquy:

Q. Did you say anything to him after he did that?

A. I told him I didn't want to have sex with him.

Q. What happened after that?

A. He continued to try to—he kept on going. I guess he thought maybe I'd change my mind or something, but **I kept telling him to stop**. I didn't want to have sex with him.

Q. What was he doing exactly? What was he doing with his body?

A. He was talking to me, and I guess he was trying to have sex with me. **I was telling him to stop**.

Q. Did you feel anything touching you?

A. I felt it touch me.

Q. Where did you feel it?

A. Where did I feel it?

Q. Yes. What part of your body?

A. On my vagina.

Q. What part of his body was touching your vagina?

A. His penis.

---

1. "It ain't so much a question of not knowing what to do. I knowed whut's right and wrong since I been ten. I heared a lot of stories and I reckon they are true about how girls're put upon by men. I know I mustn't fall into the pit, but when I'm with a feller, I fergit! I jist a girl who cain't say no, I'm in a turrible fix. I always say 'come on, le's go,' jist when I orta say nix!" (Original ————— Text) *See http://www.mbnet.mb.ca/~dsparkes/oklahoma/ lyrics.html1.*

Q. **You said you told him to stop. Is that right?**

A. **Yes.**

Q. **What would he do after you told him this?**

A. He would tell me to relax. I can't remember his exact words, but basic things so I wouldn't be so nervous and scared.

Q. How many times did he put his penis against your vagina?

A. I guess about maybe three to five times.

(Emphasis added.)

After being recalled to the stand pursuant to a court member's request to rehear her testimony, TH again testified about the assault in the conference room:

Q. I didn't understand your answer. Could you say that again?

A. He touched my vagina with his penis.

Q. Okay. Were you telling him anything during this?

A. I had told him to stop.

Q. After you told him that, did he ever do it again?

A. Yes, he did several times.

Q. About how many times did you tell him to stop?

A. It was probably like three to five times on an estimate.

The indecent assault in the conference room occurred when appellant continued to rub his penis against the victim's vagina (three to five times) after being told to stop. As the majority acknowledges, TH told appellant she did not want to have sex with him but appellant "kept touching her with his penis and telling her to relax, and she told him to stop." 54 MJ at 88. The majority concludes the victim drew the line at sexual intercourse and says appellant's conduct "did not cross that line." 54 MJ at 90. I disagree with the majority that the facts show, in the context of this encounter, that TH only expressed an unwillingness to have sexual intercourse. TH not only told appellant that she did not want to have sexual intercourse, but she told him pointedly to stop touching

her vagina with his penis. When he failed to do so, as the evidence clearly shows, he engaged in indecently assaultive behavior. When a woman tells a would-be paramour to stop touching her body improperly, she draws the line! When the paramour persists in engaging in the same conduct that has been explicitly rejected, the paramour has crossed that line!

While I agree with the majority that TH failed to manifest any displeasure with appellant's amorous advances during the first part of their encounter in the conference room, I disagree with the conclusion that TH consented to appellant's heavy petting with her after his return from "checking on things at the CQ desk." When told "no," appellant clearly took advantage of his rank, experience, and size to continue indecently assaulting the victim after she realized that, for whatever reason, she no longer wished to be romantically involved.

Appellant was also convicted of attempting to kiss TH and attempting to touch her buttocks over her clothes. This offense occurred in the barracks latrine approximately 3 days after TH had said "no" to appellant's advances in the conference room. Although, as the majority points out, both TH and appellant had talked to one another during the intervening 3 days, there was no evidence that TH had led appellant to believe that she wished to have any type of romantic relationship with him.

It was appellant who instructed TH to go to a female latrine ("We talked a little while and he had told me to ditch my friend and meet him up in—it was a broken down or under repair, the bathroom on the second floor. It was a female latrine."). For safety purposes, TH took her roommate and battle buddy, PVT Perry, with her to this latrine and asked Perry to remain in a janitor's closet nearby. After waiting for 20 or 30 minutes, appellant arrived. The transcript reveals poignantly what happened next:

Q. What happened once the accused arrived?

A. He was talking to me.

Q. Do you remember what kinds of things he was saying?

A. He was getting on me about talking to him at parade rest and things like respecting him as an NCO because people might start thinking something. I can't remember everything he was saying, but that's what I remember.

Q. Did the accused do anything to you while you were in the latrine with him?

A. He had touched my face at first, he had tried kissing me, and he had tried touching my buttocks, but I didn't want him touching me, so I backed up.

The evidence shows that TH did nothing to lead appellant to believe that she was interested in any type of romantic relationship. In fact, she specifically stated that her feelings about appellant had changed during the intervening period between the incident in the conference room and her meeting him in the latrine. According to TH, her feelings changed because she had talked with her roommate, Perry, about the situation; had talked with her brother, who is in the military; and appellant's supposed divorce was not yet final. Although appellant committed no further advances on TH after she stepped back from him in the latrine, his offer to kiss her and touch her buttocks, without justification, constitutes an offense under the Uniform Code of Military Justice.

Under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), I have no trouble concluding that any rational trier of fact could have found that appellant was guilty of all the elements of indecent assault in Charge III, Specification 2, and that TH did not consent to appellant's placing his penis against her vagina. Accordingly, I would affirm appellant's conviction of so much of Charge III, Specification 2, as finds he indecently assaulted PFC TH, a person not his wife, by placing his penis against her vagina, with the intent to gratify his lust and sexual desires. Additionally, I conclude that the evidence presented in support of Charge III, Specification 3 (the latrine incident) is sufficient to convict appellant of an assault in

Violation of Article 134, UCMJ, 10 USC § 934.

## MISTAKE OF FACT INSTRUCTION

"Absent plain error, failure to object to instructions as given or to request additional instructions forfeits the issue on appeal." *United States v. Guthrie*, 53 MJ 103, 106 (2000), citing *United States v. Maxwell*, 45 MJ 406, 426 (1996); RCM 920(f), Manual for Courts–Martial, United States (1995 ed.). While, the failure to request an affirmative defense instruction is not always dispositive of the issue, no such instruction was required or even warranted in this case.

In his opening statement, defense counsel said: Members of the panel, I want to make one thing clear, exactly what the defense's position is in this case. What the evidence will show is that the allegations of [PFC TH] and [PVT BD] are total lurid fiction. There's no truth to them.... This is a case about whether any of this happened at all.

Appellant never testified. The defense theory was that the two victims were liars and could not be trusted. As defense counsel confirmed when affirmatively rejecting any instructions other than those given, this was an "all or nothing" case. The sum of the defense case-in-chief was a parade of witnesses who testified that the two victims lacked credibility.

As I concluded in *United States v. Lee*, 52 MJ 51, 53 (1999) (Crawford, J., concurring in the result): "The key to effective advocacy on behalf of one's client ... requires the advocate to do many things ..., including making rational choices based on the unique circumstances of each case...." *See also United States v. Pineda*, 53 MJ 244 (2000) (Crawford, C.J., concurring in the result). Had defense counsel requested a mistake of fact instruction in this case and been refused, the military judge would have erred. Such is not the case.

Defense counsel's declination of any honest and reasonable mistake of fact instruction was not the result of inattention to the evidence presented or lack of knowledge of the law. One must look at instructions in the

context of the evidence presented during a court-martial. The utter absence of any notion of a mistake of fact in the defense's case leads me to the conclusion that defense counsel, presumed competent, affirmatively waived this instruction. For counsel to have asked for such an instruction would have undermined his theory of the case (nothing happened and that TH was lying). *See United States v. Taylor*, 26 MJ 127, 131 (CMA 1988).

There has been no finding or even an allegation before this Court that appellant's trial defense counsel was incompetent in selecting his theory of the case or in his trial of this court-martial pursuant to that theory.

The burden of establishing plain error lies with the appellant. *United States v. Reist*, 50 MJ 108, 110 (1999). Unpersuaded that the military judge committed any error in failing to instruct on the mistake of fact affirmative defense, let alone plain error, and firmly convinced that the evidence is legally sufficient to sustain this conviction, I would affirm the decision of the Army Court of Criminal Appeals.

SULLIVAN, Judge (dissenting):

I join Chief Judge Crawford's dissenting opinion on Issues I and II. Issues III and IV, I would resolve against appellant on the basis of this Court's decisions in *United States v. Jette*, 25 MJ 16 (CMA 1987), and *United States v. Townsend*, 49 MJ 175, 179 (1998). As for Issue V, I see no prejudice in this case. *See United States v. Biagase*, 50 MJ 143, 153 (1999) (Sullivan, J., concurring in the result). I would affirm.