UNITED STATES, Appellee,

v.

Private First Class William R. FRANCIS,
United States Army, Appellant.

ARMY 9900829.

U.S. Army Court of Criminal Appeals.

13 Dec. 2000.

For Appellant: Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA; Captain David S. Hurt, JA; Captain Kevin J. Mikolashek, JA (on brief).

For Appellee: Colonel David L. Hayden, JA; Lieutenant Colonel Edith M. Rob, JA; Major Mary E. Braisted, JA (on brief).

Before MERCK, Senior Judge, TRANT, and CURRIE, Appellate Military Judges.

## OPINION OF THE COURT

TRANT, Judge:

A military judge, sitting as a special court-martial empowered to adjudge a bad-conduct discharge, convicted appellant, pursuant to his pleas, of absence without leave, wrongful use of marijuana (three specifications), and wrongful use of lysergic acid diethylamide (LSD), in violation of Articles 86 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 886 and 912a [hereinafter UCMJ]. The approved sentence was a bad-conduct discharge, confinement for ninety days, forfeiture of $250.00 pay per month for three months, and reduction to Private E1. Appellant received fifty-five days confinement credit.

Appellant avers that the military judge erred by failing to shift the burden of persuasion to the government to prove that no unlawful command influence (UCI) existed once appellant had met his burden of producing sufficient facts to constitute UCI. We disagree.

 The burdens of production and persuasion concerning UCI at trial and on appeal, although they are clearly analogous, are somewhat different. As the court held in *United States v. Biagase,* 50 M.J. 143 (1999):

At trial, the accused must show facts which, if true, constitute unlawful com-

mand influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings.

*Id.* at 150 (citations omitted). The defense has the initial burden of production of raising the issue of UCI at trial by bringing forth "some evidence" that UCI will potentially cause the proceedings to be unfair. *United States v. Ayala,* 43 M.J. 296, 300 (1995) (citation omitted); *see also United States v. Johnson,* 54 M.J. 32, 34 (2000). While this threshold is low, it is more than mere allegation or speculation. *United States v. Johnston,* 39 M.J. 242, 244 (C.M.A.1994) (citing *Green v. Widdecke,* 19 U.S.C.M.A. 576, 579, 42 C.M.R. 178, 181, 1970 WL 7035 (1970)).

 On appeal, the appellant has the initial burden of raising UCI and must:

(1) allege facts which, if true, constitute unlawful command influence;

(2) show that the proceedings were unfair; and

(3) show that the unlawful command influence was the cause of the unfairness.

*United States v. Stombaugh,* 40 M.J. 208, 213 (C.M.A.1994); *see also United States v. Richter,* 51 M.J. 213, 223–24 (1999); *United States v. Levite,* 25 M.J. 334, 341 (C.M.A. 1987)(Cox, J., concurring). The first "prong" of *Stombaugh* is identical to the first part of the *Biagase* test. While the second and third prongs of the *Stombaugh* test and the second part of *Biagase* both focus on the unfairness of the proceedings and the causal connection to the UCI, they do so from different perspectives. Under *Biagase,* the trial judge looks prospectively at the potential impact of the UCI; under *Stombaugh,* the appellate court looks retrospectively at the actual effect, if any, upon the completed trial. *Biagase,* 50 M.J. at 150 (citations omitted). Once the defense meets its initial burden of production, at trial or on appeal, the burden shifts to the government to convince the court beyond a reasonable doubt that the findings and sentence are not affected by the UCI. We review the military judge's findings of fact under a clearly erroneous standard and the question of UCI flowing from

those facts as a question of law de novo. *United States v. Ayers,* 54 M.J. 85, 95 (2000); *United States v. Wallace,* 39 M.J. 284, 286 (C.M.A.1994) (citing S. Childress and M. Davis, 2 Federal Standards of Review §§ 2.01 and 2.14 (2d ed.1992)).

■ Defense called three witnesses (two Privates First Class and a Specialist), members of appellant's platoon, who testified that appellant's squad leader, Staff Sergeant (SSG) Eaton, held a meeting with approximately twenty to thirty members of appellant's platoon shortly after appellant returned from his unauthorized absence. At the meeting, SSG Eaton told them not to associate with appellant. Defense also called appellant's team leader, who testified that he was at a noncommissioned officer (NCO) meeting when Lieutenant Koester, appellant's platoon leader, told the NCO's that appellant should be separated from the rest of the soldiers. All four witnesses testified that they were never told not to testify on appellant's behalf and never threatened with adverse repercussions if they did elect to testify on appellant's behalf. All four witnesses also stated that if appellant asked them to testify on his behalf, they would do so.

The government called SSG Eaton, who testified that his message to the members of his platoon at the subject meeting was, essentially, when a soldier hangs out with the wrong crowd, it's easier to get "in a little bit of trouble." Staff Sergeant Eaton punctuated his admonition by relating his own personal history of falling in with the wrong crowd when he was a teenager and ending up in drug rehabilitation. The government also called another supervisor of appellant, who testified that he was never told not to testify on appellant's behalf, that he was never threatened with adverse repercussions if he did elect to testify on appellant's behalf, and, that if appellant asked him to testify on his behalf, he would do so. Lieutenant Koester testified that he did tell the NCO's in his platoon to be watchful of appellant, who had come up positive on a drug urinalysis, to ensure that he wasn't placed in a position of responsibility, that he didn't hurt himself, and that he didn't get into any more trouble

than he was already in. Lieutenant Koester did not recall ever telling the NCO's not to associate with appellant.

The defense counsel argued that, if NCO's took the stand, they would not say that they felt like they were influenced not to come in and testify. The military judge then inquired, "Do you have any reason to believe that they would testify favorably for Private Francis?" and defense counsel answered, "No, Your Honor, I don't." The following colloquy then occurred:

MJ: Can you tell me what evidence, physical evidence, documentary evidence, what witnesses you've been unable to procure because of actions of Lieutenant Koester and Sergeant Eaton, assuming of course that their actions constitute command influence? Why do you [ ] think the proceedings are unfair I guess is what I'm asking you?

DC: Your Honor, I don't have any evidence of that.

. . . .

MJ: [H]ave you found anybody that was pressured not to testify?

DC: No, Your Honor, I haven't.

MJ: You've done interviews of people within the platoon ... the company, and you are satisfied that if the evidence was there, that you would have uncovered it.

DC: Yes, Your Honor.

MJ: Favorable evidence for your client.

DC: Yes, Your Honor.

On the basis of this record, the military judge made the following findings:

(1) Sometime between 15 and 22 May 1999, Staff Sergeant Eaton, the accused's Squad Leader, called a meeting of approximately 20 of his soldiers. The accused was not present. One of the issues discussed was the troubles facing Private Francis. Staff Sergeant Eaton told the soldiers that "The accused had come up hot on a urinalysis, was going to get court-martialed and go to jail, and that they needed to stay away from him as any association would be bad for them," or words to that effect. While I find Staff Sergeant's Eaton's motivations to be altruistic and well-intended, as he was simply trying to keep them from

going down the wrong path themselves and commit similar misconduct, the clear message received by the squad was "Stay away from Francis. He is bad news." Within a week of this meeting, a message filtered down to the platoon through several NCO's that Lieutenant Koester did not want anyone to have anything to do with the accused;

(2) Other than these two instances, there have been no other communications or orders to members of the accused's unit about this case;

(3) No specific individuals were targeted by either Staff Sergeant Eaton or Lieutenant Koester with regard to this case;

(4) Charges were preferred on 11 June 1999; and

(5) There is no evidence that anyone has been pressured not to testify; and there is no evidence any soldier has been discouraged from testifying.

I find the accused has been able to procure all physical and documentary evidence and witnesses available to him despite actions of Lieutenant Koester and Staff Sergeant Eaton. Though Lieutenant Koester and Staff Sergeant Eaton are not Commanders, they were acting under the mantle of authority when their messages were relayed and recited and acted on behalf of the command.

These findings of the military judge are fully supported by the record and we adopt them. However, the military judge also found that:

> Though charges had not yet been preferred, I find the comments and actions by Lieutenant Koester and Staff Sergeant Eaton in essence to stay away from the accused *to be reasonably understood by the listener as an attempt to influence or interfere with potential witnesses, and thus constitute an unlawful—and thus constitute unlawful command influence.*

(emphasis added). To the extent that this latter finding is a finding of fact, we find it to be clearly erroneous, and to the extent that it

is a conclusion of law, we disagree and reach a different conclusion. *Cf. Ayers,* 54 M.J. at 95; *United States v. Morris,* 49 M.J. 227 (1998). Not only was there no evidence that any member of appellant's unit reasonably understood the subject admonitions as an attempt to influence, or interfere with, potential witnesses, there was compelling evidence to the contrary, to wit, every defense and government witness did not so understand. The clear import of SSG Eaton's admonition, and the one that every witness took away from the meeting, was that the witness should avoid falling in with the wrong crowd where he was more likely to get into trouble himself.[1] We thus find that the defense failed to meet its burden of production on the first part of the *Biagase* test at trial. *Cf.* 50 M.J. at 150. Based upon our review, we find beyond a reasonable doubt that the findings and sentence have not been affected by UCI. *Cf. id.* at 151; *Stombaugh,* 40 M.J. 208; *United States v. Thomas,* 22 M.J. 388 (C.M.A.1986).

Even if we agreed with the military judge that appellant had met his burden of production on the first part of *Biagase* at trial, the military judge further found that:

> However, while I am satisfied the defense has met its burden and production of proof with respect to the first prong of the *Stombaugh* analysis, I find that they have not met their burden with respect to prongs two and three. The defense has been unable to show how or why these proceedings are unfair, or that the unlawful command influence was the approximate [sic] cause of the unfairness. Specifically, I find the defense has been unable to demonstrate what legally and logically relevant evidence has not or could not be produced as a result of these allegations of interference.

■ Appellant's assignment of error is premised upon the erroneous conclusion that, because appellant satisfied the first part of *Biagase* (referred to as the first prong of *Stombaugh* by the military judge), the burden of persuasion shifted at that point to the government without appellant having to sat-

---

1. In numerous records of trial reviewed by this court, we come across appellants who, normally during their allocution statements, tearfully confess how their troubles with the law started when they fell in with the wrong crowd.

isfy any further burden of production. While we agree with the military judge that appellant failed to meet his burden of production on the second and third prongs of *Stombaugh,* the military judge had no responsibility to make that determination at trial, *cf. Biagase,* 50 M.J. at 150. Appellant's burden of production required, however, that, in addition to satisfying the first part of *Biagase,* to show facts, which, if true, constituted UCI, appellant must also show "that the alleged unlawful command influence has a logical connection to the courts-martial, in terms of its potential to cause unfairness in the proceedings." *Id.* (citations omitted). Although the military judge's reference to the second and third prongs of *Stombaugh* may have blurred the basis of his ruling, the aggregate effect of his findings, quoted above, was that appellant failed to meet his burden of production to show a logical connection between the alleged UCI and any potential unfairness in the court-martial. Thus, the burden of persuasion legally never shifted to the government. *Cf. Ayers,* 54 M.J. at 95. The determination of whether appellant has satisfied the second and third prongs of *Stombaugh* is the responsibility of the appellate court, not the trial court. *Biagase,* 50 M.J. at 150. We find that as appellant has failed to produce "some evidence" of proximate cause between the acts constituting the alleged UCI and the outcome of his court-martial, appellant has failed to carry his initial burden of production. *Cf. Ayers,* 54 M.J. at 95; *Ayala,* 43 M.J. at 300.

■ Even if we agreed that appellant had met his burden of production on all three prongs of *Stombaugh,* we would find that the government met its burden of persuasion beyond a reasonable doubt that these facts do not constitute UCI and, alternatively, that, assuming UCI, it had no prejudicial impact on appellant's court-martial. *Cf. Biagase,* 50 M.J. at 151. At trial, the military judge's findings, quoted above, further found:

> However, at this point, though I am convinced beyond a reasonable doubt that Lieutenant Koester's and Staff Sergeant Eaton's actions have not prejudiced these proceedings, I order the following remedial measures to address any perceived taint

and prevent future interference with potential witnesses:

> (1) Captain Hayes, the Alpha Company Commander, will issue a retraction to all members of 1st Platoon. The retraction will include reference to Lieutenant Koester's and Staff Sergeant Eaton's communications regarding disassociation with Private Francis. Captain Hayes will tell all soldiers that it is their duty to testify on behalf of Private Francis, if called; that no retribution or other unfavorable actions will be taken against them if they do testify for Private Francis; and that all 1st Platoon members will make themselves available for interview by [defense counsel]. Lieutenant Koester and Staff Sergeant Eaton will be present during Captain Hayes' retraction;

> (2) The government is prohibited from calling any witnesses or introducing evidence on sentencing;

> (3) The government will produce all relevant witnesses requested by the defense;

> (4) I will allow Private Francis to testify about what he thinks people would say about him, if called;

> (5) Private Francis will not be cross-examined by trial counsel during sentencing, if he chooses to testify;

> (6) Lieutenant Koester and Staff Sergeant Eaton are barred from this building for the remainder of the trial unless called as witnesses; and

> Finally, I will consider any other remedial measures suggested by the accused.

The military judge denied a defense request for sentence reduction as an additional remedial measure. The colloquy concluded as follows:

> MJ: Any other remedial measures addressing the trial itself and access to witnesses?
>
> DC: No, Your Honor.
>
> MJ: Do you believe that that will address any perceived taint that may have arisen as a consequence of their actions?
>
> DC: Yes, Your Honor.

It is manifestly clear that the military judge, in finding "beyond a reasonable doubt" that no prejudicial effect resulted

from the alleged UCI, correctly placed the burden of persuasion on the government and required the requisite quantum of proof. We review this legal determination de novo and arrive at the same conclusion. In spite of his appropriate denial of the defense motion, the military judge gratuitously afforded appellant extensive remedies to remove any perceived taint of UCI. While we are reluctant to criticize judges who, out of an overabundance of caution, grant unwarranted relief to an accused, the approach employed in the instant case deprived the government of any fair opportunity to present admissible aggravation evidence.[2] Nevertheless, the net result, and the one undoubtedly intended by the military judge, was that even a hint of prejudice, which was infinitesimal at most, was completely ameliorated. *See United States v. Rivers*, 49 M.J. 434, 434 (1998). Thus, assuming arguendo, that UCI existed in this case, we are convinced that the extensive remedial measures directed by the military judge fully ensured beyond a reasonable doubt that the findings and sentence were not affected. *Cf. Biagase*, 50 M.J. at 152; *Rivers*, 49 M.J. 434.

The findings of guilty and the sentence are affirmed.

Senior Judge MERCK and Judge CURRIE concur.

---

2. Additionally, the military judge found the actions of SSG Eaton and LT Koester amounted to illegal pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813, citing *United States v. Stamper*, 39 M.J. 1097 (A.C.M.R.1994), and awarded appellant thirty days confinement credit. While we cannot and would not disturb the military judge's decision, we do consider it to be an unwarranted windfall for appellant. The actions of SSG Eaton and LT Koester do not, in our opinion, even remotely resemble the gratuitously disparaging remarks found to be offensive in *Stamper*.