# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

### No. ACM 39444

————————————

### UNITED STATES
*Appellee*

**v.**

### Damion M. YATES
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 30 September 2019

————————————

*Military Judge:* J. Wesley Moore (arraignment); Christina M. Jimenez.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, and reduction to E-1. Sentence adjudged 29 November 2017 by GCM convened at Eglin Air Force Base, Florida.

*For Appellant:* Major Todd M. Swensen, USAF; Captain David A. Schiavone, USAF; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Senior Judge J. JOHNSON delivered the opinion of the court, in which Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Senior Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority deferred and then disapproved the adjudged forfeitures, approved the remainder of the adjudged sentence, and deferred and then waived mandatory forfeitures for a period of six months from his action on the sentence for the benefit of Appellant's dependents.

Appellant raises nine issues[2] on appeal: (1) whether the evidence is legally and factually sufficient to support his conviction; (2) whether the court should adopt the test for determining sanity under Rule for Courts-Martial (R.C.M.) 706(c)(2)(C) in order to determine whether an intoxicated person is "unable to appreciate" the nature and quality of an act; (3) whether the statutory definition of "consent" in Article 120, UCMJ, is constitutional; (4) whether the military judge erred by denying a defense motion to compel discovery; (5) whether unlawful command influence (UCI)[3] influenced the preferral and referral of the charge and specification; (6) whether the military judge erred by excluding evidence pursuant to Military Rule of Evidence (Mil. R. Evid.) 412; (7) whether Appellant received ineffective assistance of counsel at trial; (8) whether Appellant's sentence is inappropriately severe; and (9) whether the sentence of a mandatory dishonorable discharge violates the Fifth[4] and

---

[1] Unless otherwise indicated, all references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are found in the *Manual for Courts-Martial, United States* (2016 ed.).

[2] We have slightly reordered Appellant's assignments of error.

[3] We recognize Article 37(a), UCMJ, 10 U.S.C. § 837(a), prohibits unlawful influence on the military justice process by all persons subject to the UCMJ, whether or not such persons possess the mantle of command authority. *See United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). Appellant's assignment of error specifically alleges "unlawful command influence," but implicates unlawful influence more generally. Our use of the familiar abbreviation "UCI" in this opinion encompasses the concept of unlawful influence in violation of Article 37(a) generally.

[4] U.S. CONST. amend. V.

Eighth Amendments.[5] We find no prejudicial error and we affirm the findings and sentence.

## I. BACKGROUND

In late 2015, Appellant was a noncommissioned officer in charge of supply for a maintenance unit at Eglin Air Force Base (AFB), Florida. He lived alone on the base, legally separated from his wife who had primary custody of their two daughters. One member of Appellant's section was Senior Airman (SrA) JQ,[6] who Appellant had supervised for approximately one year. SrA JQ had married in August 2015, but she filed for divorce from her husband JA in late December 2015. Appellant and SrA JQ had a friendly relationship on duty, but did not socialize outside of work and had no romantic or sexual relationship.

SrA JQ was scheduled to transfer to Guam in February 2016. In January 2016, she took leave to visit family members and friends in Germany where she had grown up. While SrA JQ was in Germany, she contacted Appellant and requested to stay at Appellant's home for several days in late January 2016 before she departed for Guam at the beginning of February. Based on earlier conversations, at the time she contacted Appellant, SrA JQ was under the impression Appellant would be away from Eglin AFB on leave during her stay. Appellant agreed to let her stay, provided that SrA JQ not inform anyone that she was staying at his house. Appellant also informed SrA JQ that his plans had changed and that he and she would "be under the same roof for a few days." SrA JQ later testified that she did not change her plans based on this new information because she "didn't want the hassle of finding a different place to stay," "[s]taying under the same roof didn't bother [her]," and she trusted Appellant.

After SrA JQ returned from Germany she spent another week in Jacksonville, Florida, visiting family members and friends before driving to Eglin AFB late on the night of 27 January 2016. After she arrived, SrA JQ and Appellant spent some time drinking wine and talking for "a couple hours." When Appellant inquired about SrA JQ's husband, JA, she told Appellant she and JA were "taking a break" to give each other "some space," but were "not separated." She later explained she did not reveal to Appellant that she had filed for divorce because she did not want Appellant "getting any ideas that

---

[5] U.S. CONST. amend. VIII.

[6] SrA JQ was an airman first class (E-3) at the time of the offense and a senior airman (E-4) at the time of Appellant's trial.

[she] might be interested." In the course of their conversation, SrA JQ did reveal that she had worked as a dancer in an "adult entertainment" club for three years before she joined the Air Force. That night, SrA JQ slept on Appellant's living room sofa while Appellant slept in his bed.

Although Appellant's original plans to travel out of state had changed, he still took leave from work during SrA JQ's stay. On 28 January 2016, SrA JQ completed some final outprocessing tasks on Eglin AFB. That night, at SrA JQ's suggestion, she and Appellant went to a "strip club" near the base. Appellant and SrA JQ stayed at the club for approximately a "couple of hours" and drank a "couple of beers" before returning to Appellant's house and going to sleep. According to SrA JQ, Appellant did not attempt to flirt with her during the evening.

The following day, 29 January 2016, after Appellant helped SrA JQ return her rental car, SrA JQ bought two bottles of wine. At some point that day she began drinking wine at Appellant's home and subsequently became "drunk." Later SrA JQ invited her friend and former supervisor, Staff Sergeant (SSgt) EC, to visit her at Appellant's house. SSgt EC agreed to come over after he got off work at approximately 2130 that night. SSgt EC noticed SrA JQ's text messages included uncharacteristic misspellings, which he attributed to SrA JQ being under the influence of alcohol. SSgt EC had difficulty finding the house and called SrA JQ's phone for directions. Appellant answered the phone and informed SSgt EC that SrA JQ was asleep. When SSgt EC asked if he should still come over, Appellant replied that he should and that Appellant would awaken SrA JQ.

SSgt EC later testified that when he entered the house, he saw SrA JQ "passed out on the couch." She was wearing "spandex pants" and a "tube top with straps." Appellant woke SrA JQ up by "touching her" and telling her SSgt EC had arrived. The three of them then sat talking in Appellant's living room. Appellant and SSgt EC were drinking beer while SrA JQ continued to drink wine. SSgt EC observed SrA JQ's eyes were "glossy and bloodshot," she was slurring her speech, and her conversation was "going all over the place." SrA JQ was able to pour herself a glass of wine and walk without falling, although she "dragg[ed] her feet a little" and "wobbled." SSgt EC also observed SrA JQ leaning against furniture when she stood. Appellant, by contrast, did not appear to SSgt EC to be under the influence of alcohol.

At one point in the evening, SrA JQ spoke to SSgt EC when they were away from the living room. SSgt EC later testified,

> she was explaining to me the situation of how she originally was going to stay at [Appellant's] house and it being vacant. He was supposed to be on leave and how it was kind of a shocking

4

factor to her that he was going to be there. She was just letting me know that there was no attraction towards him and for me not to get the wrong impression because he was her supervisor.

As the night wore on, SSgt EC noticed SrA JQ was "drifting in and out" of the conversation, and her head would periodically fall forward. Eventually, she "fell asleep" with her head on SSgt EC's lap. SSgt EC continued to talk with Appellant for up to another hour with SrA JQ sleeping on his lap. Finally, after being at Appellant's house for approximately two or three hours, SSgt EC carefully arose and laid SrA JQ's head back on the couch. SrA JQ remained "completely out" and did not stir. Appellant said he would "take care of" SrA JQ and "put her to bed." When SSgt EC departed, SrA JQ was still lying on the sofa with a blanket on top of her.

In total, SrA JQ consumed one beer and almost two bottles of wine on 29 January 2016. She did not later recall falling asleep before SSgt EC arrived. She did remember SSgt EC being at Appellant's house and SSgt EC and Appellant "introduc[ing] each other about their jobs." SrA JQ's next memory was of being scooped up in someone's arms. Her next memory after that was waking up as she lay on her back on Appellant's bed, with Appellant penetrating her vagina with his penis. At trial, SrA JQ described her memories of the event:

> A. [SrA JQ] . . . I have little bits and pieces of memories, but I don't exactly have a timeline of them still.
>
> Q. [Senior Trial Counsel] And do you know where those memories came from, if you have little bits and pieces?
>
> A. Just over the next couple of weeks I started remembering things, little stuff.
>
> Q. But is that one memory of him on top of you penetrating you, has that been the same memory all along?
>
> A. Yes.

SrA JQ further recalled that at some point Appellant moved his penis toward her face, and she pushed him away "hard." SrA JQ did not know how long the sexual activity lasted, but she remembered that at some point Appellant stopped and laid down next to her. SrA JQ laid in the bed "for a minute" and cried. She could not remember if her top had been removed, but her pants had been removed. Eventually she moved back to the living room, put on another pair of shorts, and sent a series of four text messages to her then-husband JA who was in Alaska at the time, which read:

> [JA].. can I please hear your voice? I think something really awful just happened to me

5

> I'm shaking and I can't control it

> I would fly out there right now just for a 30 minute hug from you.. something awful just happened to me you're my only wanted comfort [JA] please just let me hear your voice

> [JA]..

JA did not immediately respond.

SrA JQ could not recall if she remained awake or fell asleep again. However, she was awake when Appellant awoke, walked into the living room, and said "Morning." When Appellant departed the house that morning, SrA JQ packed her belongings. When Appellant returned, SrA JQ told him to drive her to the car rental agency, which he did. SrA JQ testified:

> A. The first ten minutes [of the drive] I didn't say anything at all.

> . . . .

> Q. How did the conversation go after that?

> A. He kind of kept pushing. Please say something. Can you please say something. The look on your face. He told me about his mother was violated, and he has two daughters. Please say something. I told him that you violated me. I told him I never wanted anything from him, and he knew that.

> Q. What did he say to you?

> A. He kept apologizing.

> . . . .

> Q. Once you got to [the car rental agency], what did you do at that point, do you remember?

> A. Yes. I went in and got a car. I still had a bunch of bags in his car. So, he waited, and then I came back out and started switching my bags. He helped me get some of my stuff out and then told me that -- kept apologizing, and then told me that if I wanted him to, he would turn himself in to the First Sergeant.

> Q. You tell him you wanted him to?

> A. I don't think I said anything.

> Q. What did you do after that?

> A. I left. That was the last time I saw him since [sic] the courts.

Although JA had been asleep when SrA JQ initially texted him, after he saw the messages JA called SrA JQ repeatedly and sent her a number of text messages. SrA JQ initially did not respond to JA until he threatened to contact SrA JQ's father. SrA JQ later explained that she was ashamed and "didn't really want anything to do with [JA] anymore." Eventually SrA JQ did speak with JA, who encouraged her to report the incident and provided her the contact number for the Sexual Assault Response Coordinator (SARC) at Eglin AFB.

SrA JQ contacted the SARC and met with a representative of that office for approximately two hours that day. SrA JQ made a restricted sexual assault report, went to the hospital on Eglin AFB, and underwent a sexual assault forensic examination. That day, SrA JQ met with SSgt EC again and told him she had been "raped." SrA JQ stayed at SSgt EC's home that night and moved to a hotel the next day.

Soon thereafter, SrA JQ transferred to Guam as scheduled. However, after SrA JQ arrived on Guam she "started getting very angry about the whole incident," and she wanted Appellant "held accountable." Approximately three weeks after she arrived in Guam, SrA JQ made an unrestricted report of sexual assault, which resulted in an investigation by the Air Force Office of Special Investigations (AFOSI). AFOSI investigators arranged for SrA JQ to contact Appellant by text on the pretext that she was concerned she might be pregnant. When contacted, Appellant responded that he had been "drunk off [his] ass," expressed surprise that SrA JQ could not remember what happened, and provided SrA JQ the following version of the incident, subsequently admitted as a prosecution exhibit:

> After [SSgt EC] left, I got up and turned off everything. I told you I was going to leave you on the couch for the night, you said no and to take you to bed. So I picked you up and took you to bed, I put you under the covers and laid down and was about to pass out. The room was spinning when I laid down I was so drunk. I was tumbling [sic] pretty hard when I was carrying you. I was dozing off then you were up on me, so I turned over and we rubbed on each other. One thing lead to another. Q, you took your own pants off, you rolled over, I did not make you do anything. Thats [sic] why the next day it blew my mind when you came at me like that. I was drunk, maybe if I were more sober I would of [sic] stopped it. But on everything I love [I] didnt [sic] just start f[**]king you. Even the sex itself was just sex. I mean at one point you pushed my head into your vagina. I've replayed the whole thing in my head a million times at least and I regret it ever happened but I have never taking [sic]

7

advantage of anyone sexually. We were both drunk, and did something stupid, and it cost us so much.

On 6 May 2016, Appellant provided a written statement to AFOSI agents addressing the sequence of events from SrA JQ's request to stay at his home until her departure the morning after the assault. On 26 May 2016, AFOSI agents reviewed the statement with Appellant in the presence of his defense counsel and asked Appellant clarifying questions. Appellant's account was similar to SrA JQ's trial testimony in many respects. However, Appellant's version differed from SrA JQ's most significantly in two ways: first, his inclusion of certain alleged statements and actions by SrA JQ that were the subject of the Defense's notice and motion pursuant to Mil. R. Evid. 412, analyzed below; and second, his detailed description of the sexual acts he engaged in with SrA JQ, including his claim that SrA JQ initiated and actively participated in the encounter. Appellant's statements to the AFOSI agents were not introduced into evidence at trial.

## II. Discussion

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required

element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

As charged in Appellant's case, the elements of the Specification of the Charge of sexual assault in violation of Article 120, UCMJ, included the following: (1) that at the time and place alleged, Appellant committed a sexual act upon SrA JQ, to wit: penetrating her vulva with his penis; and (2) that Appellant did so when SrA JQ was incapable of consenting to the sexual act due to impairment by an intoxicant, and that condition was known or reasonably should have been known by Appellant. *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 45.b.(3)(f); *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9 (10 Sep. 2014), ¶ 3–45–14.c. A person is "incapable of consenting" to a sexual act when the person "lack[s] the cognitive ability to appreciate the sexual conduct in question or . . . the physical or mental ability to make [or] to communicate a decision about whether they agree[ ] to the conduct." *See United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2015) (citation omitted).

### 2. Analysis

We find the military judge was presented with ample evidence at trial to find the Government had proven both elements of the offense beyond a reasonable doubt. As to the first element, SrA JQ clearly testified Appellant penetrated her with his penis. Appellant's response to SrA JQ's pretextual text message orchestrated by AFOSI admits as much, although not in so many words.

As to the second element, SrA JQ testified she drank one beer and nearly two bottles of wine at Appellant's home over the course of 29 January 2016. Although her memories of that night are limited, SSgt EC's testimony demonstrated the extent of SrA JQ's impairment due to alcohol. SrA JQ had already become drunk and passed out or fallen asleep even before SSgt EC arrived at approximately 2200. After Appellant roused her, she continued to drink wine. SSgt EC observed SrA JQ's eyes were "glossy and bloodshot," her speech was slurred, she walked unsteadily, and she leaned against furniture when standing. Eventually, SrA JQ had difficulty staying awake during the conversation, finally fell asleep in SSgt EC's lap for up to an hour, and did not stir when SSgt EC departed. Appellant was present throughout this time, had ample opportunity to observe SrA JQ's condition, and did not appear to SSgt EC to be impaired by alcohol. The military judge was under no obligation to find Appellant's self-serving response to SrA JQ's pretext message credible, and could reasonably conclude Appellant moved SrA JQ to his bed and committed the sexual act when he knew or reasonably should have known she was incapacitated.

Appellant contends the evidence portrays a different scenario. According to Appellant, SrA JQ—newly-liberated from the restrictions of her marriage to JA—at least "on a subconscious level . . . wanted to have sex with Appellant, and engaged in a series of sexually provocative behaviors and discussions over three days to pique his sexual interest in her." These behaviors included, *inter alia*, telling Appellant about sexual "difficulties" with her husband JA, informing Appellant that she had worked as a dancer in an adult club for three years, and requesting that Appellant take her to a strip club. Appellant contends that SrA JQ's alcohol consumption on 29 January 2016 did not render her incapable of consenting but rather lowered her inhibitions, bringing her perhaps latent sexual interest in Appellant to the surface, and as a result she engaged in consensual sexual intercourse with him.

Appellant's argument focuses substantially on the testimony of Dr. CR, a clinical psychologist who testified for the Government as an expert in forensic psychology and the effects of alcohol on the brain. Dr. CR testified, *inter alia*, that SrA JQ's testimony regarding the night of the sexual assault was consistent with a "fragmentary blackout." Dr. CR explained that a fragmentary blackout occurs when information comes into the brain, "but then it cannot get biochemically processed into long-term memory because the alcohol is interfering." An individual experiencing a fragmentary blackout will remember certain points in time, but will have blocks of time in between that they cannot remember. Dr. CR distinguished experiencing a blackout from being "passed out" or in a "stuporous state," and testified that individuals are capable of complex motor functions despite being in a memory blackout—the more habituated the individual is to the particular activity, the more capable they are of performing it. Whereas blackout deals with the continuum of memory, stupor deals with the continuum of consciousness—the person's awareness of what is happening around them.

We agree with Appellant that the essential question with regard to proof of the offense of sexual assault is not how alcohol affected SrA JQ's memory of that night, but how it affected her capacity to consent to sexual activity. However, we are not persuaded that the military judge was misled with regard to the applicable standard for incapacity by either Dr. CR's testimony or trial counsel's findings argument.

With respect to Dr. CR, Appellant draws attention to the expert's testimony that experiencing a blackout is "highly correlate[d] with not appreciating what you are doing because by definition your frontal lobes are affected -- the executive function that we talked about earlier." However, Appellant's characterization of Dr. CR's testimony as "[e]ssentially . . . blacked-out drunk people cannot consent to sex because they do not make good decisions" is an oversimplification. In the context of Dr. CR's entire testimony, which distin-

guished between the continuum of memory and the continuum of consciousness, Dr. CR indicated that a person who experienced a blackout was also likely to experience impairment of their cognitive ability because alcohol consumption can affect the brain to induce both conditions. Furthermore, Dr. CR agreed with trial counsel that, notwithstanding the correlation, "you've got [to] look at the other evidence to see [if] this disinhibition or appreciation or whatever applies in the particular case." We would find Dr. CR's testimony more concerning and the risk of confusion to the finder of fact greater in a trial by court members, rather than by a military judge who is presumed to know the law. *See United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted). We are confident the military judge did not improperly equate evidence of memory blackout with proof of incapacity to consent to sexual activity.

With respect to trial counsel's closing argument, Appellant asserts trial counsel improperly "conflated 'incapable of consent due to intoxication' with being . . . 'unaware.'" The result, Appellant posits, are "questions as to whether . . . the military judge thought [SrA] JQ was 'unaware' or because she thought [SrA JQ] was 'incapable' of consenting." Citing *United States v. Riggins*, 75 M.J. 78 (C.A.A.F. 2016), Appellant contends that unawareness and incapacity to consent are mutually exclusive theories of culpability. We are not persuaded.

First, we reiterate that military judges are presumed to know the law, and to the extent trial counsel's argument misstates the law we presume the military judge followed the latter rather than the former. *See Erickson*, 65 M.J. at 225 (citation omitted). Second, we do not read trial counsel's argument to equate "incapable of consent due to intoxication" with "unaware" as Appellant contends. Rather, it appears trial counsel was contrasting 10 U.S.C. § 920(g)(8)(B), which provides *inter alia* that a "sleeping, unconscious, or incompetent person cannot consent" to a sexual act, with the criteria for "incapable of consenting" under 10 U.S.C. § 920(b)(3)(A) as set forth in *Pease*, that is, "lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make [or] to communicate a decision about whether they agreed to the conduct." 75 M.J. at 185–86 (first and second alterations in original) (citation omitted). In other words, trial counsel was making the point that in order for Appellant to be guilty of the charge, SrA JQ did not need to be asleep, unconscious, or otherwise unaware the sexual conduct was occurring, so long as she was "unable to appreciate" the nature of the conduct. Third, we note trial counsel specifically referred to *Pease* in his argument, mitigating any risk that the military judge might have overlooked the applicable law.

Appellant contends SrA JQ's memory of forcefully pushing Appellant away from her when he brought his penis towards her mouth demonstrated she was not incapable of consenting because she in fact demonstrated a lack of consent to that particular act. However, we are not persuaded that SrA JQ's physical resistance to a sexual act necessarily demonstrated that she was capable of consenting at an earlier point in time when Appellant committed the charged sexual act upon her.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of the Charge and Specification beyond a reasonable doubt. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction of the Charge and Specification are therefore both legally and factually sufficient.

**B. Test for Ability to Appreciate the Nature and Quality of an Act**

**1. Law**

We review issues of legal and factual sufficiency de novo. *Washington*, 57 M.J. at 399 (citation omitted). We also review questions regarding the interpretation and constitutionality of a statute de novo. *United States v. Reese*, 76 M.J. 297, 300 (C.A.A.F. 2017) (citing *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016)); *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005) (citations omitted).

A person is "incapable of consenting" to a sexual act for purposes of Article 120(b)(3), UCMJ, when the person lacks either the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make or to communicate a decision about whether they agree to the conduct. *See Pease*, 75 M.J. at 186.

Rule for Courts-Martial (R.C.M.) 706(c)(2)(C) provides that a board created to conduct an inquiry into the mental capacity or mental responsibility of an accused shall make findings as to whether, *inter alia*, "the accused, at the time of the alleged criminal conduct and as a result of [a] mental disease or defect, [was] unable to appreciate the nature and quality or wrongfulness of his or her conduct."

**2. Analysis**

Essentially, Appellant contends the definition of "incapable of consenting" to a sexual act for purposes of Article 120(b)(3), UCMJ, developed by the Navy-Marine Corps Court of Criminal Appeals and endorsed by the United

States Court of Appeals for the Armed Forces (CAAF) in *Pease*, stated above, requires further definition, particularly with regard to the meaning of the term "appreciate." Appellant contends we should look to R.C.M. 706, which also uses the term "appreciate" in the context of inquiries into the mental capacity or mental responsibility of an accused, as well as court decisions interpreting that term. Citing *United States v. Martin*, Appellant observes the term "appreciate" connotes not mere knowledge of particular conduct, but "understanding of the moral or legal import of [the] behavior." 56 M.J. 97, 107 (C.A.A.F. 2001) (quoting *United States v. Freeman*, 357 F.2d 606, 623 (2d Cir. 1966)).

To the extent Appellant suggests that we explicitly rely on R.C.M. 706(c)(2)(C) to interpret the term "incapable of consenting" as that term is used in Article 120(b)(3), UCMJ, we find it unnecessary to do so. "[I]t is a well known principle that '[w]ords generally known and in universal use do not need judicial definition.'" *United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (second alteration in original) (quoting *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000)) (additional citations omitted). We do not find the term "appreciate" as used by our sister court and the CAAF in *Pease* to be so esoteric as to require us to look outside Article 120, UCMJ, for additional definition. Furthermore, while we recognize the CAAF essentially approved our sister court's analysis of the phrase "incapable of consenting" in *Pease*, 75 M.J. at 185–86, we also find it significant that the CAAF in *Bailey* "conclude[d] that the phrase 'incapable of consenting' does not *require* additional definition" where "consent" is defined in the statute and "incapable" may be afforded its plain meaning of "being unable to do something." 77 M.J. at 15 (emphasis added).

Even if we did apply case law interpreting the term "appreciate" in the context of R.C.M. 706 to *Pease's* definition of "incapable of consenting," we cannot see how Appellant would benefit. Appellant pivots from *Martin's*, 57 M.J. at 107, explanation that the term "appreciate" includes an understanding of the moral and legal consequences of one's behavior to *United States v. Cockerell*, 49 C.M.R. 567, 577 (A.C.M.R. 1974), where the Army Court of Military Review explained that "[a]ny voluntary choice [to consume alcohol] carries with it responsibility and if the person is aware of prior episodes of irrational behavior after consumption of alcohol then [s]he is aware that [her] choice to drink alcohol increases the risk of harm to others." Appellant then contends that because SrA JQ "was aware that when she got drunk, she did things she did not remember. . . . her choice to get 'blacked-out' drunk does not relieve her of responsibility for her choice to have sex with Appellant." However, we find Appellant's analogy of a sexual assault victim's condition as a result of voluntary intoxication to the question of the criminal responsibility for an intoxicated accused to be most inapt. The essential question is

whether SrA JQ was incapable of consenting to the sexual act due to impairment by an intoxicant, and whether Appellant knew or reasonably should have known of her condition; the essential question is not the *process* by which SrA JQ came to be in that condition. *Martin* and *Cockerell* contribute little if anything to that analysis.

At best, Appellant's argument is an extension of his contention that the evidence was factually insufficient to support his conviction because SrA JQ was merely blacked out and simply could not remember her voluntary participation in consensual sex with Appellant. Appellant contends SrA JQ's actions during the sexual encounter indicate she "appreciated" the sexual nature of the conduct; however, his argument relies substantially on Appellant's own self-serving account of the incident, which the military judge evidently found less than credible and which we are similarly not bound to accept. As noted above, SrA JQ's isolated memory of forcefully shoving Appellant away as he brought his penis toward her face sometime after the assault began does not demonstrate she was capable of consenting when Appellant earlier penetrated her with his penis, as charged. Similarly, SrA JQ's texts to her then-husband JA soon after the assault that something "awful" had happened—Appellant posits the "awful" thing was that she "cheated on her husband"—does not demonstrate her capacity to consent when Appellant began the sexual assault.

## C. Constitutionality of Article 120, UCMJ

Appellant contends the 2012 change to Article 120, UCMJ, unconstitutionally modified the statutory definition of "consent." We disagree. In order to explain why, we must first examine the applicable statutory language.

### 1. Law

We review the constitutionality of a statute de novo. *Disney*, 62 M.J. at 48 (citations omitted).

Prior to 28 June 2012, Article 120(c)(2), UCMJ, 10 U.S.C. § 920(c)(2), *Manual for Courts-Martial, United States* (2008 ed.) (2008 *MCM*), provided:

> (c) *Aggravated sexual assault.* Any person subject to this chapter who—
>
> . . . .
>
> (2) engages in a sexual act with another person of any age if that other person is substantially incapacitated or substantially incapable of—
>
>> (A) appraising the nature of the sexual act;
>>
>> (B) declining participation in the sexual act; or

> (C) communicating unwillingness to engage in the sexual act; is guilty of aggravated sexual assault and shall be punished as a court-martial may direct.

Article 120(r), UCMJ, 10 U.S.C. § 920(r) (2008 *MCM*), provided, in pertinent part, "[c]onsent and mistake of fact as to consent . . . are an affirmative defense for the sexual conduct in issue in a prosecution under . . . subsection (c) (aggravated sexual assault), . . . ." Article 120(t)(14), UCMJ, 10 U.S.C. § 920(t) (2008 *MCM*), provided, in pertinent part:

> The term "consent" means *words or overt acts indicating* a freely given agreement to the sexual conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the accused's use of force, threat of force, or placing another person in fear does not constitute consent. . . . A person cannot consent to sexual activity if—
>
> . . . .
>
> (B) substantially incapable of—
>
> (i) appraising the nature of the sexual conduct at issue due to—
>
> (I) mental impairment or unconsciousness resulting from consumption of alcohol, drugs, a similar substance, or otherwise . . . .

(Emphasis added).

Effective 28 June 2012, Article 120, UCMJ, was substantially revised. At the time of Appellant's trial, Article 120(b)(3)(A), UCMJ, 10 U.S.C. § 920(b)(3)(A) provided:

> (b) *Sexual Assault*. Any person subject to this chapter who—
>
> . . . .
>
> (3) commits a sexual act upon another person when the other person is incapable of consenting to the sexual act due to—
>
> (A) impairment by any drug intoxicant, or other similar substance, and that condition is known or reasonably should be known by the person . . . is guilty of sexual assault . . . .

With regard to the definition of "consent," Article 120(g)(8), UCMJ, 10 U.S.C. § 920(g)(8), provided, *inter alia*:

(A) The term 'consent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. . . .

(B) A sleeping, unconscious, or incompetent person cannot consent. A person cannot consent to force causing or likely to cause death or grievous bodily harm or to being rendered unconscious. . . .

(C) Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions.

"Inferences and presumptions are a staple of our adversary system of fact-finding." *County Court v. Allen*, 442 U.S. 140, 156 (1979). "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis v. Franklin*, 471 U.S. 307, 314–15 (1985) (citing *Allen*, 442 U.S. at 157–63). In contrast, the Constitution prohibits evidentiary presumptions "that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Id.* at 313 (citing *Sandstrom v. Montana*, 442 U.S. 510, 520–24 (1979)) (additional citations omitted).

### 2. Analysis

Appellant notes the 2012 change to Article 120, UCMJ, removed the phrase "words or overt acts indicating" from the statutory definition of "consent." Appellant claims this removal "results in a shift from an objective standard to a subjective standard from the alleged victim's perspective that words or overt acts are no longer relevant to determining if consent was 'freely given.'" Appellant contends the result is a "permissive inference" of a lack of consent, citing the analysis of punitive articles contained in the *MCM*. *See* App. 23, at A23–16 ("[T]he amended definition of 'consent' allows a permissive inference of lack of consent based on the circumstances of the case."). Appellant concludes,

the permissive inference of lack of consent is unconstitutional because the instruction that an "incompetent" person cannot consent turns that permissive inference into a mandatory presumption of incompetence. Additionally, it permits a conviction

based simply on the alleged victim not remembering saying something, or engaging in an overt act, that indicated consent.

We find Appellant's argument unpersuasive for multiple reasons. It is telling that in such a fundamental attack on the current formulation of Article 120, UCMJ, enacted in 2012, Appellant cites no substantiating decision from the CAAF, from this court, or from any of our sister service courts. It simply does not follow that the removal of the phrase "words or overt acts indicating" from the statutory definition of "consent" means evidence of such words or acts become "irrelevant" to the determination of the existence of consent, as Appellant alleges, or to the existence of a reasonable mistake of fact as to consent. Under the new definition, such words or acts would logically remain highly relevant to determining whether the alleged victim "freely [agreed] to the conduct at issue." *See* Article 120(g)(8), UCMJ, 10 U.S.C. § 920(g)(8). Moreover, the possibility that the finder of fact may infer a lack of consent, depending on the circumstances of the case, does not necessarily relieve the Government of its burden to prove guilt beyond a reasonable doubt or offend the Due Process Clause where reason and common sense would justify such an inference. *See Franklin*, 471 U.S. at 313.

However, for purposes of resolving Appellant's claim in the instant case, it is sufficient to note his argument is simply inapposite given the particular charge of which he was convicted. In this case, the Government was required to prove beyond a reasonable doubt that SrA JQ was incapable of consenting to the sexual act due to impairment by an intoxicant, *and that Appellant knew or reasonably should have known* she was so impaired. Thus, his conviction did not rest on any subjective belief of SrA JQ that she did not or could not consent, but on proof of incapacity and either Appellant's actual knowledge or an objective standard of reasonableness under the circumstances. "[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Parker v. Levy*, 417 U.S. 733, 759 (1974) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)). Accordingly, we find Appellant's assignment of error to be without merit.

**D. Discovery**

Appellant asserts the military judge erred when she failed to disclose to the Defense, after *in camera* review, certain communications among judge advocates at various echelons related to the preferral and referral of the charge against Appellant, over which the Government asserted attorney-client privilege. The Defense sought these records at trial in order to support an anticipated motion to dismiss for pretrial UCI. In order to explain the mil-

itary judge's ruling and our own conclusions, we must recount the somewhat convoluted process by which Appellant's court-martial was convened.

### 1. Additional Background

#### a. The Initial Charge

On 3 November 2016, Appellant's squadron commander, Lieutenant Colonel (Lt Col) MB, preferred against Appellant one charge and specification of sexual assault on SrA JQ when she was incapable of consenting due to impairment by an intoxicant, in violation of Article 120, UCMJ. Lt Col MB's indorsement to the charge sheet recommended trial by general court-martial. A preliminary hearing pursuant to Article 32, UCMJ, 10 U.S.C. § 832, was held on 19 November 2016. The preliminary hearing officer (PHO), Lt Col DF, found there was no probable cause to believe Appellant was guilty of the charged offense based on the victim's impairment by an intoxicant, but found there may be probable cause with respect to other theories of sexual assault, including by bodily harm or against a person who was sleeping, unconscious, or otherwise unaware. Nevertheless, Lt Col DF recommended that the charge and specification be dismissed and that Appellant not be tried because he believed Appellant would be acquitted in a prosecution for any sexual assault charge.

Lt Col DF's report was delivered to the special court-martial convening authority, the commander of the 96th Test Wing (96 TW/CC). 96 TW/CC's staff judge advocate (SJA), Colonel (Col) MT, disagreed with Lt Col DF and opined that there was probable cause to support the preferred charge and specification. Col MT recommended 96 TW/CC forward the case to the general court-martial convening authority, the commander of the Air Force Test Center (AFTC/CC), with a recommendation to convene a general court-martial. However, 96 TW/CC agreed with the PHO, Lt Col DF, that the charge and specification should be dismissed. On 25 January 2017, he forwarded the case to AFTC/CC with a recommendation that the charge and specification be dismissed without prejudice and the case be returned to Appellant's squadron commander, Lt Col MB, for whatever action that officer deemed appropriate.

On 30 January 2017, AFTC/CC's SJA, Col JB, provided her pretrial advice pursuant to Article 34, UCMJ, 10 U.S.C. § 834, and concurred with the recommendation to dismiss the charge and specification. On 30 January 2017, AFTC/CC signed a memorandum informing General (Gen) EP, the commander of Air Force Materiel Command (AFMC) and the next general

court-martial convening authority in the chain of command, of his decision not to refer the charge for trial by general court-martial.[7]

On 31 January 2017, Col MT, the 96th Test Wing SJA, informed SrA JQ of AFTC/CC's decision not to refer the charge for trial. On 17 February 2017, SrA JQ's special victims' counsel (SVC), Captain (Capt) SR, submitted to all reviewing authorities a request for a new preliminary hearing under Article 32, UCMJ, citing Lt Col DF's comments during the hearing and his alleged consideration of certain inadmissible evidence. On 23 February 2017, Gen EP returned the case and forwarded Capt SR's request to AFTC/CC. On 27 February 2017, AFTC/CC denied Capt SR's request for a new preliminary hearing and dismissed the charge and specification.

### b. The Subsequent Charge

However, the AFMC legal office (AFMC/JA) was evidently still considering the case. On 7 April 2017, Major (Maj) LP, the AFMC/JA chief of military justice, and Capt CZ, a senior trial counsel, interviewed SrA JQ in the presence of her SVC, Capt SR. The substance of this interview was recorded in a nine-page written summary. On 20 April 2017, the AFMC SJA, Col EB, sent a memorandum to the legal office of the Air Force Life Cycle Management Center (AFLCMC), a subordinate organization within AFMC but outside the chain of command of the 96th Test Wing and Air Force Test Center. Attached to the memorandum were an AFOSI report of investigation, a copy of the summary of the 7 April 2017 interview of SrA JQ, and a draft charge sheet. The memorandum requested that an AFLCMC officer be identified "to decide to prefer or not to prefer the Article 120 allegation covered by the attached investigation pursuant to R.C.M. 307 [Preferral of Charges]. The officer (ideally, an O-6) must have command experience and experience in making preferral decisions, preferably involving sexual assault allegations." The memo-

---

[7] This was consistent with Section 1744(d) of the 2014 National Defense Authorization Act, which provides:

> In any case where a staff judge advocate, pursuant to [Article 34, UCMJ, 10 U.S.C. § 834], recommends that charges of a sex-related offense should not be referred for trial by court-martial and the convening authority decides not to refer any charges to a court-martial, the convening authority shall forward the case file for review to the next superior commander authorized to exercise general court-martial convening authority.

Pub. L. No. 113–66, § 1744(d), 127 Stat. 672, 981 (2013).

randum further requested a judge advocate be made "available to advise this officer on process and procedure."

On 2 May 2017, Col EB, the AFMC SJA, sent an email to the Chief Trial Judge of the Air Force to notify him there would "soon" be a request for the appointment of an "experienced judge" to serve as PHO for an Article 32 hearing in the case. The message stated, *inter alia*, "we had [sic] another pre-ferral from an officer outside the original chain of command."

On 4 May 2017, Col TQ, the AFLCMC vice commander, preferred against Appellant one charge and two specifications of sexual assault in violation of Article 120, UCMJ. The first specification alleged sexual assault by causing bodily harm to SrA JQ; the second specification, substantially similar to the one previously preferred on 3 November 2016, alleged commission of a sexual act on SrA JQ when she was incapable of consenting due to impairment by an intoxicant. On 9 May 2017, Appellant's squadron commander, Lt Col MB, signed an indorsement to the charge sheet addressed to AFMC/CC (i.e., Gen EP) which again stated that Lt Col MB recommended trial by general court-martial. The same day, Lt Col MB informed Appellant of the new charge and specifications. On 10 May 2017, Col MT, 96th Test Wing SJA, signed for receipt of the charge on behalf of the summary court-martial convening authority.

On 25 May 2017, Gen EP designated Maj MR, a military judge, as PHO for a preliminary hearing pursuant to Article 32, UCMJ. The hearing took place on 12 June 2017. Maj MR found probable cause to believe Appellant committed the charged offenses and he recommended trial by general court-martial. On 10 July 2017, Gen EP referred the charge and both specifications for trial by general court-martial. The specification alleging sexual assault by causing bodily harm was eventually withdrawn and dismissed on 17 October 2017, leaving the remaining specification of which Appellant was ultimately convicted.

### c. Discovery Litigation

On 5 September 2017, the Defense submitted to the Government a supplemental discovery request seeking "copies of all documents relating to the processing of this case at all levels of the Air Force Materiel Command (AFMC). . . . from 5 October 2016 (the date the Report of Investigation was completed) until 10 July 2017 (the date of referral)." On 17 October 2017, Col JS, the new AFMC SJA, asserted attorney-client privilege on behalf of Gen EP "for correspondence amongst the client's representatives, lawyers, and lawyer's representatives." Other judge advocates in the chains of command, including Maj LP at AFMC/JA, Col JB at AFTC/JA, and Col JS the AFLCMC SJA, similarly asserted the privilege when the Defense attempted to inter-

view them. The Defense was able to obtain a certain number of documents, but the Government continued to assert privilege over many more.

On 4 October 2017, the Defense moved to compel discovery of "documents and correspondence" related to the "spontaneous resurrection" of the charge against Appellant in order to explore whether UCI was involved. In response, the Government asserted the Defense was not entitled to the withheld documents which were covered by the attorney-client privilege and to some extent the attorney work product discovery exemption. The military judge received additional evidence and heard argument on the motion at a hearing on 18 October 2017. At the conclusion of the hearing, the Government provided the military judge a disc—included in the record of trial as a sealed appellate exhibit—containing the emails and other documents over which the Government was asserting privilege, in the event the military judge found *in camera* review to be appropriate.

In a written ruling dated 2 November 2017, the military judge denied the defense motion to compel discovery. After reviewing the sequence of events summarized above, reciting the applicable law, and considering the evidence and arguments of counsel presented at the motion hearing, the military judge found there was a "sufficient factual basis demonstrating a reasonable likelihood that the records contain relevant information" that "an *in camera* review of the materials may reveal evidence to establish that an exception to the lawyer-client privilege exists." Accordingly, she had reviewed the material provided by the Government. She found the material fell into three categories. First, she found a small number of communications were between legal offices and either a SVC or a defense counsel, which would not be covered by the asserted attorney-client privilege because they included a third party. Second, she found a majority of the communications within and between command legal offices were "largely not lawyer-client privilege communication or work product," but rather "common correspondence indicating attempts to reach people, sending attachments, or receipts of the same, along with typical back-and-forth communication pertaining to the myriad steps necessary to process administrative matters related to a court-martial." Although the military judge found communications in these two categories were not privileged, she also found they were "not relevant based on the evidence before the court on the issue of UCI." The third category of communications she found contained information that, "in varying degrees . . . may be deemed attorney-client privilege;" these she also found were "not relevant . . . and do not implicate an exception to the attorney-client privilege."

### 2. Law

In reviewing discovery matters, we conduct a two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclo-

sure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)). We review a military judge's decision on a request for discovery for an abuse of discretion. *Roberts*, 59 M.J. at 326 (citation omitted). "A military judge abuses [her] discretion when [her] findings of fact are clearly erroneous, when [s]he is incorrect about the applicable law, or when [s]he improperly applies the law." *Id*. The military judge's determination as to the materiality of the requested information is a question of law we review de novo. *Id*.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (quoting *Strickler*, 373 U.S. at 280).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ . . . as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnote omitted). Accordingly, Article 46 and these implementing rules provide a military accused statutory discovery rights that are greater than those afforded by the Constitution. *See id*. at 187 (citations omitted); *Roberts*, 59 M.J. at 327. In particular, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." However, R.C.M. 701(f) exempts "notes, memoranda, or similar working papers prepared by counsel and counsel's assistants and representatives," as well as information shielded from disclosure by the Military Rules of Evidence. *See United States v. Bowser*, 73 M.J. 889, 897 (A.F. Ct. Crim. App. 2014), *aff'd*, 74 M.J. 326 (C.A.A.F. 2014) (mem.).

In addition to discovery rights under R.C.M. 701, R.C.M. 703 provides "[e]ach party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a par-

ty's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703(f)(1), Discussion).

Mil. R. Evid. 502(a) establishes a lawyer-client privilege applicable to trials by court-martial, and provides, *inter alia*, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional services to the client" between a client and the lawyer and between lawyers representing the client. "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Mil. R. Evid. 502(b)(4). The lawyer is presumed to have authority to claim the privilege on behalf of the client in the absence of evidence to the contrary. Mil. R. Evid. 502(c). However, "the privilege is not absolute." *Bowser*, 73 M.J. at 899–900. "Normally, in camera review is an appropriate mechanism to resolve competing claims of privilege and right to review information." *United States v. Wright*, 75 M.J. 501, 510 (A.F. Ct. Crim. App. 2015) (en banc) (citing R.C.M. 703(f)(4)(C); *United States v. Zolin*, 491 U.S. 554, 569 (1989)).

Where the defense specifically requests discoverable information that is erroneously withheld, the error is tested for harmlessness beyond a reasonable doubt. *Coleman*, 72 M.J. at 187 (citations omitted). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.* (citation omitted).

### 3. Analysis

Appellant contends the military judge abused her discretion by denying the motion to compel discovery. We have reviewed the material over which the Government asserted privilege and the military judge reviewed *in camera*. We find the military judge did not abuse her discretion by denying the motion to compel because the requested documents were not material to the Defense's case, regardless of whether or not they fell within the attorney-client privilege.

In general, an accused has the right to discovery of documents in the possession of the Government which are "material to the preparation of the defense." R.C.M. 701(a)(2)(A). The military judge found all the communications in question were not "relevant" to the issue of UCI, and therefore, by implication, not "material to the preparation of the defense." "Relevant" means having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Mil. R. Evid. 401. We do not agree with the military judge that all the

communications were *irrelevant* to the question of UCI. This is because at least some of the communications had *some* tendency to make the existence of UCI *less probable*, by demonstrating the 4 May 2017 preferral and 10 July 2017 referral of the charge and specification came about as a result of lawful and appropriate communications. Nevertheless, we agree that the communications were not "material" to the Defense because they would have been of no assistance in substantiating a claim of UCI. For similar reasons, to the extent the Defense's motion implicated Appellant's right to the production of evidence under R.C.M. 703, we conclude the withheld communications would not have contributed to the Defense's presentation of a motion regarding UCI, and therefore they were not "relevant and necessary." *See Rodriguez*, 60 M.J. at 246.

Because we find the withheld communications were not material to the Defense, and therefore not subject to *Brady*, R.C.M. 701, or R.C.M. 703, we need not specifically examine the military judge's determination of which communications were and were not privileged. Similarly, we leave for another day detailed analysis of the scope of the attorney-client privilege to communications involving government lawyers in the context of court-martial proceedings.

Assuming *arguendo* the military judge erred by denying disclosure of some or all of the withheld communications, we find the error harmless beyond a reasonable doubt. The communications would have been of no material assistance to the Defense's effort to demonstrate actual or apparent UCI. Accordingly, we find disclosure would have had no effect on the outcome of the trial. *See Coleman*, 72 M.J. at 187.

**E. Unlawful Command Influence**

**1. Additional Background**

At the conclusion of the 18 October 2017 motion hearing, trial defense counsel indicated the Defense intended to file a motion regarding UCI regardless of the outcome of the military judge's pending ruling on the motion to compel discovery. At the outset of the next trial session held on 28 November 2017, the military judge attached her written ruling denying the discovery motion to the record as an appellate exhibit. The military judge then summarized an off-the-record conference she had held with counsel pursuant to R.C.M. 802 and noted, "[c]ounsel indicated that they were going to be withdrawing a motion so there was not a need for a motions hearing yesterday." There was no further discussion at trial of a motion regarding UCI, and no such motion appears in the record. On appeal, however, Appellant alleges his trial was tainted by UCI on account of charges being re-preferred against him after they had been dismissed.

**2. Law**

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted). "Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact under a clearly-erroneous standard, but we review *de novo* the legal question whether those facts constitute unlawful command influence." *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)). "On appeal, the accused bears the initial burden of raising unlawful command influence." *Salyer*, 72 M.J. at 423.

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. "[W]hen an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (footnote omitted) (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted). "Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the government to. . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute un-

lawful command influence." *Id.* (quoting *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may still prevail if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

The CAAF "has long recognized that Article 37(a) prohibits unlawful influence by *all persons subject to the UCMJ.*" *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). The test for unlawful influence by an individual acting without the mantle of command authority is essentially the same as the test for unlawful command influence. *Id.* at 76–77.

**3. Analysis**

We find Appellant has failed to meet his burden to make an initial showing of "some evidence" of UCI.[8] AFTC/CC's decision to dismiss the charge and specification that were initially preferred against Appellant on 3 November 2017 did not bar later preferral of the same specification or a different specification related to the same offense. *See* R.C.M. 401(c)(1), 407(a)(1). After the dismissal, Gen EP retained the authority as the AFMC commander to take further action with respect to the offense alleged against Appellant. *See* R.C.M. 306(a) ("Each commander has discretion to dispose of offenses by members of that command."). Such action includes forwarding the matter to a subordinate authority for disposition, including "investigation of allegations and preferral of charges, if warranted." R.C.M. 306(c)(5), Discussion. Furthermore, any person subject to the UCMJ may prefer a charge. R.C.M.

---

[8] The Government does not argue that Appellant waived or forfeited his allegation of UCI by failing to bring a motion before entering his pleas. *See* R.C.M. 905(b)(1) ("[d]efenses or objections based on defects . . . in the preferral, forwarding, or referral of charges, or in the preliminary hearing" must generally be raised before pleas are entered); *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999) (finding failure to raise at trial alleged UCI in preferral of charges waived issue on appeal where evidence of alleged UCI was "readily available" before trial). Recognizing our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce waiver or forfeiture in order to correct a legal error, for purposes of our analysis under the particular circumstances of this case we assume without deciding that Appellant has preserved the issue. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018) (citing *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001)).

307(a). Accordingly, we find the forwarding of the investigative file regarding the alleged offense for consideration of possible preferral of charges from AFMC to AFLCMC through SJA channels was consistent with the Rules for Courts-Martial and does not, in itself, warrant any inference of UCI. However, Appellant makes several arguments in an effort to pinpoint more specific evidence of unlawful influence.

During the discovery motion hearing, the Defense called as a witness Lt Col MB, Appellant's squadron commander. Lt Col MB preferred the original 3 November 2016 charge and specification against Appellant, and in his indorsement to the charge sheet he recommended trial by general court-martial. However, after the initial Article 32 hearing, Lt Col MB agreed with the recommendation and ultimate decision to dismiss the charge and specification. On 4 May 2017, the same day Col TQ, the AFLCMC vice commander, preferred the subsequent charge and specifications, a member of the 96th Test Wing legal office sent Lt Col MB an email regarding processing the newly-preferred charge. Lt Col MB was provided a draft indorsement to the charge sheet which again stated, *inter alia*, "I recommend the charges [sic] be referred to trial by general court-martial." However, the accompanying email explained Lt Col MB could "choose to sign or modify" the indorsement as he "[saw] fit."

On 9 May 2017, in accordance with R.C.M. 308,[9] Lt Col MB informed Appellant of the charge and specifications. On the same day he signed the indorsement, without modification, such that it still purported to recommend trial by general court-martial. Lt Col MB testified to the effect that, although he did not actually believe trial by court-martial was warranted and he knew he could change the first indorsement, he did not believe his recommendation would have any effect on the proceedings and it was not worth his time to edit the indorsement. He further testified he was not pressured to sign the draft version of the indorsement. Accordingly, although the indorsement that accompanied the charge sheet did not accurately reflect Lt Col MB's true feelings about the case, the discrepancy was attributable to Lt Col MB himself and not the result of unlawful influence.

Appellant also argues Gen EP was disqualified as a convening authority because she was, in effect, an "accuser" in the case. *See* R.C.M. 504(c)(1).

---

[9] R.C.M. 308(a) requires the accused's immediate commander to "cause the accused to be informed of the charges preferred against the accused, and the name of the person who preferred the charges . . . as soon as practicable."

> Under Article 1(9), UCMJ, [10 U.S.C. § 801(9),] an accuser is an individual: (1) "who signs and swears to charges"; (2) "who directs that charges nominally be signed and sworn to by another [type two accuser]"; or (3) "who has an interest other than an official interest in the prosecution of the accused [type three accuser]."

*United States v. Ashby*, 68 M.J. 108, 129 (C.A.A.F. 2009) (alterations in original) (quoting 10 U.S.C. § 801(9)). The CAAF has explained "[t]he test for determining whether a convening authority is an 'accuser' . . . is whether [s]he 'was so closely connected to the offense that a reasonable person would conclude that [s]he had a personal interest in the matter.'" *United States v. Voorhees*, 50 M.J. 494, 499 (C.A.A.F. 1999) (quoting *United States v. Jackson*, 3 M.J. 153, 154 (C.M.A. 1977)). We are not persuaded the record suggests such a personal connection. There is no evidence Gen EP "directed" Col TQ or anyone else to prefer a charge against Appellant. Instead, her SJA forwarded to the AFLCMC SJA a request that an experienced officer review the matter and decide whether preferral of the charge and specifications was warranted, consistent with R.C.M. 306(c)(5). Similarly, we find no evidence Gen EP had other than an appropriate, official interest in the matter as a general court-martial convening authority.

Appellant contends the military judge "acknowledged the possibility of apparent UCI [but] did nothing to address it or remedy it, or require the Government to provide evidence disproving UCI occurred beyond a reasonable doubt." Appellant refers to the section of the military judge's discovery ruling where she explained why she found *in camera* review was warranted. The military judge wrote:

> Actions by AFMC/JA to investigate a closed matter and seek out a new commander for review may hint of influence. That AFMC/JA provided a drafted charge sheet to be considered by an "independent reviewer" also may show influence or a level of control over the legal advice to be given by AFLCMC/JA. Combined with AFMC/JA's asserted knowledge two days prior to preferral that preferral would occur, it could possibly suggest some sway over the subordinate legal office[.]

As a result, the military judge found "a sufficient factual basis demonstrating a reasonable likelihood that the records contain *relevant information*" such that *in camera* review of the withheld documents was warranted to determine if an exception to the lawyer-client privilege would apply. (Emphasis added). However, the military judge made no finding that the Defense had made an initial showing of facts which, if true, would constitute UCI—in fact, she was never presented with a UCI motion. Rather, she merely found suffi-

cient reason to believe the withheld documents contained *relevant information* to warrant *in camera* review, the result of which disclosed no material evidence of UCI.

Appellant compares his case with this court's decisions in *United States v. Wright*, 75 M.J. 501 (A.F. Ct. Crim. App. 2015) (en banc), and *United States v. Vargas*, No. ACM 38991, 2018 CCA LEXIS 137 (A.F. Ct. Crim. App. 15 Mar. 2018) (unpub. op.), *rev. denied*, 78 M.J. 51 (C.A.A.F. 2018). We find both comparisons inapt. *Wright* bears some superficial similarity to Appellant's case in that the original convening authority, in accordance with the advice of his SJA, dismissed a charge and several specifications of sexual offenses after the Article 32 investigating officer recommended the offenses not be referred to trial. *Wright*, 75 M.J. at 502. The appellant was then transferred to another command, a new charge and specifications were preferred for the same incident, and the matter was referred for trial by general court-martial by a different convening authority. *Id.* at 503. However, *Wright* was quite unlike Appellant's case given the extraordinary apparent involvement of the Secretary of the Air Force and The Judge Advocate General in transferring the appellant to a new chain of command specifically for the purpose of disposing of the sexual assault allegations. *Id.* Additionally, *Wright* did not involve an actual finding of UCI; instead, the question was whether the military judge abused his discretion in abating the proceedings where the military judge found *in camera* review of numerous communications withheld from discovery was warranted, but the Government refused to comply. *Id.* at 505–08. By contrast, in the instant case, the military judge did conduct an *in camera* review and identified no withheld documents material to a claim of UCI.

Similarly inapposite is this court's opinion in *Vargas*, which: (1) involved an alleged effort to disqualify a military judge rather than to re-prefer charges after dismissal by a convening authority; (2) did not result in a judicial finding of UCI; and (3) was decided on the military judge's failure to recuse himself rather than any finding of unlawful influence. *Vargas*, unpub. op. at *18–24. Contrary to Appellant's characterization, the initial convening authority in his case, AFTC/CC, was not "removed" from the process. On the contrary, AFTC/CC's decision to dismiss the initial charge and specification was allowed to stand without any unlawful influence. However, as explained above, that decision did not preclude further action on the alleged offense by other officers acting within the scope of their authority.

The process by which Appellant came to be tried for sexual assault may have been atypical, but Appellant has not met his burden to demonstrate some evidence, rather than speculation, of "improper manipulation of the criminal justice process which negatively affect[ed] the fair handling and/or

disposition" of his case. *See United States v. Boyce*, 76 M.J. at 247 (citations omitted).

### F. Mil. R. Evid. 412

#### 1. Additional Background

Before trial, the Defense filed a notice and motion to admit certain evidence of alleged sexual behavior by SrA JQ pursuant to Mil. R. Evid. 412.[10] The Defense relied primarily on Mil. R. Evid. 412(b)(1)(B) regarding alleged sexual behavior by the victim "with respect to" the accused offered by the Defense to prove consent.[11] In general, the Defense sought to introduce evidence of alleged statements and behavior by SrA JQ during her stay at Appellant's home that, while not involving sexual acts or even physical contact between SrA JQ and Appellant, or explicit invitations to engage in sexual behavior, tended (according to the Defense's theory) to "create a sexualized atmosphere" that would cause Appellant "to view her in a sexual manner," and was therefore relevant both to the issue of consent and to reasonable mistake of fact as to consent. The Defense cited various statements Appellant made in the course of his AFOSI interview as the basis for its notice and motion. The Government opposed much, but not all, of the Defense's motion.

The military judge conducted a closed hearing pursuant to Mil. R. Evid. 412(c)(2) at which SrA JQ testified. SrA JQ denied much of the alleged sexual behavior attributed to her, but confirmed other aspects. SrA JQ also stated that, whether she viewed the allegations of her sexual behavior as true or not, she did not object to being questioned about the vast majority of them. After receiving evidence and hearing argument on the motion, the military judge issued a written ruling that allowed the Defense to develop certain evidence, but excluded other evidence. Specifically, the military judge allowed evidence that SrA JQ told Appellant she had been a waitress and dancer at an adult club prior to joining the Air Force; that she told Appellant she used to "resent" men; that she told Appellant she was having difficulties in her marriage, including her sexual relationship with her husband JA; that SrA JQ asked Appellant to take her to a strip club; Appellant's claim that SrA JQ and Appellant discussed watching a sexually explicit movie together and dis-

---

[10] The trial transcript, appellate exhibits, and briefs addressing this excluded evidence were sealed pursuant to Mil. R. Evid. 412(c)(2) and R.C.M. 1103A. These portions of the record and brief remain sealed. Any discussion of sealed material in this opinion is limited to what is necessary for our analysis.

[11] The Defense relied on the "constitutionally required exception" under Mil. R. Evid. 412(b)(1)(C) for a certain alleged statement by SrA JQ that is not at issue on appeal.

cussed sexual fantasies; that SrA JQ laid on Appellant's bed at one point, fully-clothed and without physical contact;[12] and Appellant's claims about SrA JQ's apparently voluntary actions during the sexual encounter that constituted the charged offense.

On appeal, Appellant contends the military judge abused her discretion by excluding pursuant to Mil. R. Evid. 412 five alleged behaviors by SrA JQ, specifically evidence that: SrA JQ used her phone to send a nude photo of herself to someone else where Appellant could see what she was doing; SrA JQ showed Appellant a topless photo of another woman with whom SrA JQ claimed to have previously had a romantic relationship; SrA JQ made comments to Appellant at the strip club to the effect that she had "experience" with patrons like Appellant and could make Appellant give her a "tip;" SrA JQ told Appellant she had watched pornography and masturbated in his bed while he was out of the house; and SrA JQ changed clothes while in the same room with Appellant who, although facing away from her, could see her reflection in his computer screen.

### 2. Law

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses [her] discretion when: (1) the findings of fact upon which [s]he predicates [her] ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if [her] application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

---

[12] The military judge found this particular evidence was not "sexual behavior" or "sexual predisposition" that implicated Mil. R. Evid. 412, and was relevant and otherwise admissible under Mil. R. Evid. 401 and 403.

The second exception under Mil. R. Evid. 412 includes "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent . . . ." Mil. R. Evid. 412(b)(1)(B). Evidence that fits this exception may nevertheless be excluded if the probative value of the evidence is outweighed by the danger of unfair prejudice to the alleged victim's privacy. Mil. R. Evid. 412(c)(3). In addition, like other evidence, evidence otherwise admissible under Mil. R. Evid. 412(b)(1)(B) may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)).

"[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, . . . or interrogation that is repetitive or only marginally relevant." *United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (additional citations omitted). In determining whether the exclusion of evidence deprived Appellant of a fair trial or an opportunity for cross-examination, we ask whether "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.

### 3. Analysis

As described above, Appellant contends the military judge abused her discretion by excluding five types of evidence of alleged "sexual behavior" by SrA JQ. Appellant argues this evidence was admissible under Mil. R. Evid. 412(b)(1)(B) as specific instances of sexual behavior "with respect to" Appellant that he sought to offer to prove consent, or a reasonable mistake of fact as to consent. We find the military judge did not abuse her discretion by excluding the evidence.

Before we turn to the substance of the military judge's ruling, several observations are appropriate. First, as both parties evidently recognized, the fact that SrA JQ did not herself object to being questioned about the specific matters that are the basis of the appeal—most of which she denied in whole or in part during the motion hearing—is not determinative of admissibility under Mil. R. Evid. 412. The alleged victim's privacy concerns, or lack thereof, may be relevant to certain aspects of the analysis—for example, whether the probative value of evidence offered under Mil. R. Evid. 412(b)(1)(A) or (B)

outweighs the danger of unfair prejudice to the alleged victim's privacy under Mil. R. Evid. 412(c)(3). However, Mil. R. Evid. 412 provides that evidence of an alleged victim's other sexual behavior or sexual predisposition "is not admissible" unless it meets an exception under Mil. R. Evid. 412(b), regardless of whether or not the alleged victim objects.

Second, that SrA JQ largely denied the alleged "sexual behavior" occurred also does not determine the issue. "In applying [Mil. R. Evid.] 412, the judge is not asked to determine if the proffered evidence is true . . . . Rather, the judge serves as gatekeeper deciding first whether the evidence is relevant and then whether it is otherwise competent, which is to say, admissible under [Mil. R. Evid.] 412." *Roberts*, 69 M.J. at 27 (quoting *United States v. Banker*, 60 M.J. 216, 224 (C.A.A.F. 2004)). In this case, the Defense cited Appellant's statements to AFOSI as the basis for its notice and motion. Appellant contends the military judge erred because it "appears" the military judge "considered" SrA JQ's denials in her ruling. *See United States v. Leonhardt*, 76 M.J. 821, 826–27 (A.F. Ct. Crim. App. 2017) (finding the military judge erred by considering alleged victim's "credible" testimony that the proffered evidence was untrue). However, we find no such erroneous analysis in the military judge's ruling, which indicates she evaluated the substance of the proffered evidence rather than its veracity.

Third, although Appellant was charged with committing a sexual act on SrA JQ while she was incapable of consenting due to impairment by an intoxicant, we acknowledge evidence of statements or acts by SrA JQ prior to the charged incident that tended to indicate either that SrA JQ consented to sexual acts with Appellant, or that Appellant might reasonably believe she consented, could nevertheless be relevant to the Defense's theory of the case. In other words, consent (or reasonable mistake thereof) was a relevant issue because if SrA JQ actually consented, then she necessarily had the capacity to consent, and therefore Appellant could not be guilty on the theory of sexual assault charged by the Government—that SrA JQ was incapable of consenting due to impairment. *See* Article 120(b)(3)(A), UCMJ, 10 U.S.C. § 920(b)(3)(A).

We turn now to the substance of the military judge's ruling. The military judge essentially determined each of the five alleged statements or acts by SrA JQ that Appellant now cites on appeal did not qualify for the Mil. R. Evid. 412(b)(1)(B) exceptions because they were not "sexual behavior" that was "with respect to"—that is, directed at—Appellant, as the rule requires. We find this was not a "clearly unreasonable" application of the law to the facts. *See Ellis*, 68 M.J. at 344 (citation omitted). Engaging in sexual behavior with a third person in Appellant's presence by, for example, sending the third person a revealing photo is not necessarily sexual behavior "with respect to"

Appellant. Similarly, simply informing Appellant of earlier sexual behavior that took place outside of Appellant's presence with no connection to Appellant is also not sexual behavior "with respect to" Appellant under the facts presented here. Accordingly, we find the military judge could reasonably conclude the Defense did not meet its burden to demonstrate the admissibility of this evidence under Mil. R. Evid. 412(b)(1)(B).

Additionally, with respect to each of the five alleged statements or acts, the military judge also found any probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the members." Therefore, assuming *arguendo* the evidence qualified for the Mil. R. Evid. 412(b)(1)(B) exception, it would nevertheless be inadmissible under both Mil. R. Evid. 412(c)(3) and Mil. R. Evid. 403. We find the military judge did not abuse her discretion in performing this balancing test. *See United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995)) ("A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403.").

## G. Ineffective Assistance of Counsel

### 1. Law

The Sixth Amendment[13] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

---

[13] U.S. CONST. amend. VI.

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

### 2. Analysis

Appellant contends his trial defense counsel, Maj JF and Capt VS, failed to provide him effective assistance of counsel, specifically by failing to cross-examine SrA JQ on the specific details of the alleged sexual assault as claimed by Appellant in his statement and interview with AFOSI. Appellant asserts it was "critical for [his] recitation of events to come into evidence at trial" in a "he said, she said" case, and the account he gave to the AFOSI is credible. At the Government's request, this court ordered and received from Maj JF and Capt VS declarations responsive to Appellant's claim of ineffective assistance. Because their declarations do not raise any factual disputes, we find no post-trial evidentiary hearing is required to resolve this assignment of error. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967).

We find Appellant's claim of ineffective assistance of counsel to be without merit. As trial defense counsel explain, the decision not to cross-examine SrA JQ based on Appellant's version of the sexual encounter was a deliberate tactical choice. As they note, there is no basis to conclude SrA JQ would have offered any testimony helpful to the Defense in response to such questions. Instead, SrA JQ would presumably deny Appellant's version—to the extent that she could remember the night—or respond that she did not remember due to her impairment by alcohol, potentially further emphasizing how intoxicated she was. In either case, such cross-examination would not put Appellant's statement "into evidence." In this regard we find it significant that Appellant was tried not by court members, but by a military judge alone, who could be expected to remain keenly aware of the difference between aggressive or suggestive questioning by counsel and testimony admitted as evidence before the court. *See Erickson*, 65 M.J. at 225 (citation omitted) (military judges are presumed to know the law).

In addition, we note Appellant's response to SrA JQ's pretext message expressing concern that she might be pregnant *was* admitted in evidence as a

prosecution exhibit. As quoted above, Appellant's text was essentially a succinct version of the same account Appellant later provided to the AFOSI. Thus, Appellant's "recitation of events" did come into evidence in this form.

Accordingly, we conclude Appellant has failed to demonstrate any element of the three-pronged test for ineffective assistance articulated in *Gooch*: (1) there was a reasonable explanation for trial defense counsel's decision not to cross-examine SrA JQ on Appellant's version of the sexual encounter; (2) their advocacy did not fall measurably below the performance expected of competent defense counsel; and (3) there is no reasonable probability of a more favorable result had trial defense counsel conducted such cross-examination. *See Gooch*, 69 M.J. at 362. Therefore, we find Appellant has failed to demonstrate either deficient performance or prejudice. *See Datavs*, 71 M.J. at 424 (citation omitted).

**H. Sentence Severity**

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). We have great discretion to determine whether a sentence is appropriate, including the authority to disapprove a mandatory minimum sentence established by Article 56, UCMJ, 10 U.S.C. § 856. *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018). However, we have no authority to grant clemency or mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

**2. Analysis**

Appellant contends his sentence to three years in confinement and a dishonorable discharge is inappropriately severe; however, beyond citing the applicable legal standards, he offers no specific analysis in support of his contention. Nevertheless, recognizing our responsibility and broad authority under Article 66(c), UCMJ, to approve only so much of the sentence as we find should be approved, we have considered whether Appellant's sentence is warranted. Appellant exploited the trust of an impaired subordinate to commit a sexual assault, an offense for which he faced a maximum punishment that included, *inter alia*, 30 years in confinement and a mandatory dishonorable

discharge. The military judge determined that a sentence including three years in confinement, reduction to E-1, total forfeiture of pay and allowances (disapproved by the convening authority), and the mandatory dishonorable discharge was appropriate. We find the approved sentence is not inappropriately severe as a matter of law.

## I. Mandatory Dishonorable Discharge

### 1. Law

We review the constitutionality of a statute de novo. *Disney*, 62 M.J. at 48 (citations omitted).

The sentence of an accused found guilty of, *inter alia*, sexual assault in violation of Article 120(b), 10 U.S.C. § 120(b), "shall include dismissal or dishonorable discharge, as applicable" Article 56(b), UCMJ, 10 U.S.C. § 856(b).

### 2. Analysis

Appellant argues the Congress's establishment of a mandatory punishment of a dismissal or dishonorable discharge for an accused convicted of sexual assault in violation of Article 120(b), UCMJ, violates the Eighth Amendment's[14] prohibition against cruel and unusual punishment "and/or" the Fifth Amendment's[15] guarantee of due process in receiving individualized consideration for sentencing. We disagree.

The Constitution vests Congress with the power to "make Rules for the Government and Regulation of the land and naval Forces." U.S. CONST. art. I, § 8, cl. 14. In 2013, Congress amended Article 56, UCMJ, to provide a mandatory minimum sentence of a dismissal or dishonorable discharge for, *inter alia*, an accused convicted of the offenses of rape or sexual assault in violation of Article 120(a) or (b), UCMJ. *Kelly*, 77 M.J. at 406 (citing National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113–66, § 1705, 127 Stat. 672, 959 (2013)). Appellant cites to no decision of the CAAF, of this court, or of any of our sister service courts to the effect that such a mandatory minimum punishment violates the Constitution. *Cf. Kelly*, 77 M.J. at 407 (holding Article 66, UCMJ, authorizes the courts of criminal appeals to review a mandatory minimum sentence under Article 56, UCMJ, for sentence appropriateness).

With respect to the Eighth Amendment, the United States Supreme Court has rejected the argument that—outside the context of capital punish-

---

[14] U.S. CONST. amend. VIII.

[15] U.S. CONST. amend. V.

ment—mandatory punishments are unconstitutional. *See Harmelin v. Michigan*, 501 U.S. 957, 994–95 (1991) (upholding mandatory sentence to confinement for life). "There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.* at 995 (citation omitted); *see also United States v. Curtis*, 44 M.J. 106, 157 (C.A.A.F. 1996) (quoting *Harmelin*, 501 U.S. at 994–95). Furthermore, we find Appellant's comparison of his dishonorable discharge with the death penalty unpersuasive.

We agree with Appellant that an accused has the right to have his sentence determined by "'individualized consideration' . . . 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)). However, such consideration is given in the context of the applicable statutes enacted by Congress, including any applicable minimum and maximum punishments under Article 56, UCMJ.

Accordingly, we find appellant's assignment of error is without merit.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court